## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| FUNICULAR FUNDS, LP, individually and on behalf of all others similarly situated, | Civil Action No. 22-10986 |
| Plaintiff, |  |
| v. | **CLASS ACTION COMPLAINT** |
| PIONEER MERGER CORP., PIONEER MERGER SPONSOR LLC, JONATHAN CHRISTODORO, RICK GERSON, OSCAR SALAZAR, RYAN KHOURY, SCOTT CARPENTER, MATTHEW COREY, MITCHELL CAPLAN, and TODD DAVIS, | **JURY TRIAL DEMANDED** |
| Defendants. |  |

Plaintiff Funicular Funds, LP ("Plaintiff") alleges for its complaint against Pioneer Merger Corp. ("Pioneer" or the "SPAC"), Pioneer Merger Sponsor LLC (the "Sponsor"), Jonathan Christodoro, Rick Gerson, Oscar Salazar, Ryan Khoury, Scott Carpenter, Matthew Corey, Mitchell Caplan, and Todd Davis (together, the "Defendants") the following upon knowledge as to itself and its own actions, and upon information and belief as to all other matters.

## I.    INTRODUCTION

1.    This case involves a planned misappropriation of a $32.5 million corporate asset by the sponsor of a special purpose acquisition company (or SPAC).

2.    The SPAC, Pioneer, was formed by Alpha Wave Global, LP ("Alpha Wave") to acquire and take public a private company. Pioneer is operated by its Sponsor, an entity created and controlled by Alpha Wave and its senior personnel.

3.    Like a typical SPAC, Pioneer was structured to be a boom or bust proposition for the Sponsor and the other Defendants: they would either (i) own twenty percent of the post-

acquisition company if Pioneer successfully completed a business combination; or (ii) lose their entire investment if Pioneer failed to complete a business combination.

4.      Prior to raising money from the public, the SPAC issued millions of shares of Class B common stock (the "Founder Shares") at less than a penny per share to the Sponsor and Defendants, who were selected by Alpha Wave as the SPAC's officers and directors. In order to support this arrangement and provide working capital, the Sponsor invested an additional $10.1 million through the purchase of warrants from the SPAC.

5.      Thereafter, the SPAC raised $402.5 million in an initial public offering ("IPO") by issuing Class A common stock (the "Public Shares") to investors.

6.      The SPAC had two years to use the IPO proceeds to orchestrate a business combination. If the SPAC successfully completed a business combination, then Defendants' Founder Shares would convert to Public Shares and be worth more than $100 million on paper. If, however, the SPAC failed to close a deal, then the SPAC's assets would be returned to investors, the Founder Shares and warrants would become worthless, and Defendants would lose the capital that they invested.

7.      This economic bargain—*i.e.*, risking a complete loss of its private investment in exchange for the prospect of a notional return of 10x if the SPAC were to strike a deal—forms the heart of the SPAC structure and the compensation model for the Sponsor. Public stockholders of the SPAC relied upon this incentive structure to motivate the Sponsor to identify and close an attractive acquisition on the SPAC's behalf, and thus mitigate the risk that stockholders' capital would be tied up for the life of the SPAC with no significant returns.

8.      Defendants repeatedly acknowledged in public filings that they would lose their entire investment if the SPAC did not complete a business combination, and each Defendant

contractually agreed in connection with the IPO that they would have no "right, title, interest or claim of any kind in or to any monies held in the Trust Account *or any other asset of the [SPAC]* as a result of any liquidation" (*i.e.*, if the SPAC failed to make a deal). (Emphasis added.)

9.      In May 2021, Defendants announced a proposed transaction with Acorns Grow Incorporated ("Acorns"), a fast-growing wealth manager with a novel application to make investing and saving easier than traditional investment accounts (the "Transaction").

10.     However, by late 2021, it appears that Acorns regretted the deal, and the parties announced in January 2022 that the Transaction had been mutually terminated.

11.     Rather than enforce the SPAC's right to force Acorns to close the transaction (or seek other legal remedies), Defendants quickly negotiated a termination agreement (the "Termination") under which Acorns would pay a termination fee of up to $32.5 million—$17.5 million upfront and an additional $15 million if the SPAC were unable to identify a replacement transaction (the "Termination Fee").

12.     Shortly thereafter, Acorns completed a private fundraising round *at a higher pre-money valuation*, demonstrating that the loss of the Transaction had deprived public stockholders of significant value. However, while stockholders had lost the value of the Transaction, they had ostensibly gained the value of the Termination Fee in exchange.

13.     Following the Termination, Defendants initially attempted to find a new transaction but were ultimately unsuccessful. In December 2022, Pioneer announced that the SPAC would dissolve, triggering the remaining $15 million Termination Fee payment from Acorns.

14.     Having failed to make a deal, Defendants were required to take a loss and return the SPAC's assets to investors. Instead, they decided to extract a consolation prize for themselves: Defendants have stated that they will award the entire $32.5 million Termination Fee from Acorns

to themselves as holders of the Class B Founder Shares, while holders of the Class A Public Shares will be redeemed and will receive only the IPO proceeds (with minimal interest).

15.     Defendants have no legal or equitable entitlement to the Termination Fee or any other corporate assets of the SPAC, and Defendants' planned misappropriation violates their contractual and fiduciary duties. Moreover, given that the SPAC waived its legal remedies against Acorns to obtain the Termination Fee in the first place, permitting Defendants to keep the proceeds would render the Termination an utterly disloyal, self-dealing transaction through which Defendants traded away a corporate asset solely to line their own pockets.

16.     Defendants have stated that they plan to redeem the Class A Public Shares on or about January 13, 2023, and thereafter distribute any remaining assets, including the Termination Fee, to themselves.

17.     This action seeks an order (i) enjoining Defendants from distributing any of the SPAC's assets other than the IPO proceeds held in the SPAC's trust account; and (ii) requiring Defendants to distribute the SPAC's net assets, including the Termination Fee, to holders of Class A Public Shares.

## II.     **THE PARTIES**

18.     Plaintiff is a Delaware limited partnership and currently the largest disclosed holder of Class A Public Shares of Pioneer.

19.     Pioneer is a special purpose acquisition company, sometimes called a "blank check company," organized as a Cayman Islands exempted company. It was formed by Alpha Wave for the purpose of completing a business combination. Alpha Wave is a "diversified global alternative asset manager" operated by Defendants Gerson and Khoury.

4

20.     The Sponsor is a Cayman Islands limited liability company and is responsible for managing the SPAC. Alpha Wave formed the Sponsor and controls it through Defendant Gerson, Alpha Wave's Founder and Chairman.

21.     Defendant Christodoro is the Chairman of the SPAC's Board. He is the President and Chief Investment Officer of Patriot Global, an affiliate of Alpha Wave.

22.     Defendant Gerson is a Co-President of the SPAC. He is the Founder, Chairman and Chief Investment Officer of Alpha Wave.

23.     Defendant Salazar is a Co-President of the SPAC and is also a member of the SPAC's Board.

24.     Defendant Khoury is the SPAC's Chief Executive Officer. He is a co-Founder and Partner of Alpha Wave.

25.     Defendant Carpenter is the SPAC's Chief Operating Officer. He also is the Chief Operating Officer of Alpha Wave.

26.     Defendant Corey is the SPAC's Chief Financial Officer. He is also the Chief Financial Officer of Alpha Wave.

27.     Defendant Caplan is a member of the SPAC's Board.

28.     Defendant Davis is a member of the SPAC's Board.

### III.     JURISDICTION AND VENUE

29.     This Court has jurisdiction over this action under 28 U.S. Code § 1332(a) and (d).

30.     Venue is proper in this judicial district under 28 U.S.C. §1391(b)(1) and (2).

31.     This Court has jurisdiction over Defendants because each of the Defendants lists a business address of 660 Madison Avenue, New York, NY 10065 and Defendants transact a substantial amount of business in New York, have substantial ties to New York, and/or are citizens

5

or residents of New York or otherwise maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

32.     In addition, the Sponsor Agreement (defined below), to which each Defendant is a party, states that "any action, proceeding, claim or dispute arising out of, or relating in any way to [the Sponsor Agreement] shall be brought and enforced in the courts of New York City, in the State of New York," and Defendants agreed to "irrevocably submit to such jurisdiction and venue, which jurisdiction and venue shall be exclusive" and "waive any objection to such exclusive jurisdiction and venue or that such courts represent an inconvenient forum."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Alpha Wave Forms The Sponsor And The SPAC To Complete A Business Combination

33.     Alpha Wave (formerly known as Falcon Edge Capital) is a global alternative asset manager that offers a variety of investment products in different asset classes, themes, and geographies. It manages approximately $17.0 billion of client assets across a range of private investment funds and separately managed accounts.

34.     In October 2020, Alpha Wave, in partnership with Patriot Global (an affiliate of Alpha Wave operated by Defendant Christodoro), formed the SPAC and the Sponsor for the purpose of completing a business combination with a "leading private company that is a potential industry disruptor or innovator in a growth market."

35.     The Sponsor is controlled by Defendant Gerson, its managing member and Alpha Wave's Founder and Chairman.

36.     The SPAC's capital structure consists of two classes of common stock: Class A Public Shares issued to the public through an IPO and Class B Founder Shares issued to Defendants for a nominal amount.

37.     The Class B Founder Shares were convertible to Class A Public Shares only in the event that the SPAC successfully completed a business combination. Otherwise, they would become worthless.

38.     On October 23, 2020, the Sponsor purchased 10,062,500 Class B Founder Shares for $25,000 (*i.e.*, less than one penny per share).

39.     On December 21, 2020, the Sponsor transferred 40,000 Founder Shares to each of Defendant Davis, Defendant Caplan, and Defendant Salazar (*i.e.*, the only officers and directors not directly affiliated with Alpha Wave).

40.     Thus, all of the SPAC's "officers and directors as a group (eight individuals)" owned 100% of the outstanding Class B Founder Shares, and each had personal financial interests in the Founder Shares either directly as a holder or indirectly through affiliation with Alpha Wave.

41.     On January 12, 2021, Pioneer completed its initial public offering of 40,250,000 Class A Public Shares at $10.00 per share. Following the IPO, the Public Shares represented 80% of outstanding stock and the Founder Shares represented 20% of outstanding stock.

42.     In connection with the IPO, each of the Defendants entered into a letter agreement with the SPAC (the "Sponsor Agreement") pursuant to which they waived any entitlement under the Charter or otherwise to any assets of the SPAC in connection with a liquidation (*i.e.*, in the event that Defendants failed to complete a transaction).

43.     To provide working capital for the SPAC and induce Pioneer and the underwriter to enter into the Sponsor Agreement, the Sponsor invested $10.1 million in exchange for 6.7

million warrants issued by the SPAC in a private placement. The warrants were convertible to Class A Public Shares only in the event of a business combination, and provided no other value or rights.

44.    Pioneer's underwriter agreed to a 2% upfront underwriting discount (or commission) in connection with the IPO (equal to approximately $8.1 million), with an additional 3.5% deferred underwriting fee payable only in the event of a successful business combination.

45.    The SPAC had two years from its IPO to complete a business combination, or else it would be required to distribute its assets back to investors and dissolve.

46.    Defendants acknowledged that their Class B Founder Shares and the warrants issued to the Sponsor were structured to provide a profit to Defendants *only* if they were able to successfully complete a transaction for the SPAC.

47.    Indeed, Defendants expressly agreed in the Sponsor Agreement "that it, she or he has no right, title, interest or claim of any kind in or to any monies held in the Trust Account *or any other asset of the [SPAC]* as a result of any liquidation of the [SPAC] with respect to the Founder Shares held by it, her or him, if any." (Emphasis added.)

48.    The IPO prospectus also made clear that the "founder shares will be worthless if [Defendants] do not complete an initial business combination," "our warrants will expire worthless," and Defendants "will lose their entire investment."

49.    Further, in the SPAC's periodic filings thereafter, Defendants repeatedly reaffirmed that their "founder shares will be worthless if we do not complete an initial business combination" and "our warrants will expire worthless."

50.    Defendants had until January 12, 2023 to complete a business combination.

**B.    The Sponsor Negotiates A Business Combination With Acorns, But
The Deal Falls Through And The SPAC Obtains A Termination Fee**

51.    On May 27, 2021, the SPAC announced that it had entered into a Business
Combination Agreement (the "Transaction Agreement") with Acorns, a wealth manager that offers
a mobile application for simplified saving and investing. The Transaction provided a pre-money
valuation of Acorns of $1.5 billion.

52.    Defendants touted the merits of the Transaction with Acorns in press releases and
presentations to investors.

53.    For example, in a September 2021 investor presentation, Defendants stated that
Acorns (i) is "the largest subscription service in US consumer finance today with attractive,
recurring revenues from a base of 4.3M sticky, engaged subscribers"; (ii) expects $120 million in
annualized revenue for 2021; (iii) has "nearly 99% monthly retention" of users; (iv) operates at
"80%+" gross margin; and (v) is "[p]ositioned to address the unmet needs of the largest consumer
market in the world."



**Acorns Investment Highlights**

1. We believe Acorns is the largest subscription service in US consumer finance today with attractive, recurring revenues from a base of **4.3M sticky, engaged subscribers** with **nearly 99% monthly retention**[1], and **79% revenue growth in Q3**

2. Category leader and creator in Financial Wellness, with differentiated marketing capabilities, product positioning and consumer trust with **NPS in the 93rd percentile**

3. Positioned to address the unmet needs of the largest consumer market in the world: **everyday consumers, including 222M Americans**[2]

4. Full-stack, scalable infrastructure with **gross margin rates currently above 80%+** and significant operating leverage, managed by an experienced leadership team with deep financial, tech, product and marketing expertise

5. Opportunity for **meaningful ARPU expansion** through execution of long-term product roadmap to deliver a comprehensive money management solution for individuals and families

54.     The Transaction was expected to close in the "second half of 2021." However, it appears, at some point in late 2021, that Acorns began to second guess its agreement. By December 2021, Defendants had yet to solicit stockholder approval for the Transaction and were not positioned for a near-term closing.

55.     In early January 2022, Defendants disclosed that the deal had fallen through. Acorns had apparently changed its mind and no longer wanted to enter the public markets because of purported changes in market conditions.

56.     At this point, Defendants had a range of legal tools available to them to protect the interests of the public stockholders, including forcing Acorns to close pursuant to the terms of the Transaction.

57.     In the Transaction Agreement, Acorns agreed that "irreparable damage . . . would occur in the event that the [p]arties do not perform their respective obligations under the provisions of this Agreement (including failing to take such actions as are required of them hereunder to consummate the transactions contemplated by this Agreement)," and that the SPAC "shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement . . . in addition to any other remedy to which they are entitled at law or in equity."

58.     Acorns expressly agreed "that it *will not oppose the granting of an injunction, specific performance and other equitable relief* when expressly available pursuant to the terms of this Agreement on the basis that the other parties have an adequate remedy at law or an award of specific performance is not an appropriate remedy for any reason at law or equity." (Emphasis added.)

59.     Defendants also had a readily available legal forum because Acorns "irrevocably and unconditionally submit[ed] to the exclusive jurisdiction of the Chancery Court of the State of Delaware" for any action brought to enforce the Transaction Agreement.

60.     Notwithstanding the SPAC's contractual rights under the Transaction Agreement, Defendants opted not to pursue available legal remedies. Instead, they negotiated a quick settlement with Acorns.

61.     On January 3, 2022, Defendants announced that the SPAC had entered into a Termination Fee Agreement with Acorns pursuant to which "the parties agreed to mutually terminate [the] Business Combination Agreement."

62.     Acorns agreed to pay "an aggregate sum of $17,500,000 to the Company in monthly payments through December 15, 2022." Further, if the SPAC failed to complete "an initial business combination on or before December 15, 2022," then Acorns would "pay to the [SPAC] $15,000,000 no later than December 22, 2022." Thus, if the SPAC failed to complete a deal before its deadline, the Termination Fee from Acorns would total $32.5 million.

63.     While investors would not obtain the value of the Transaction that Defendants had promised and promoted, they would at least obtain some recompense through the Termination Fee payments.

64.     Two months later, in March 2022, Acorns completed a private fundraising round that excluded the SPAC at a $1.6 billion pre-money valuation—$100 million more than the valuation agreed with Pioneer—suggesting that the SPAC and its public stockholders had lost out on a potentially valuable deal.

65.     Thereafter, Pioneer received the initial payment of $17.5 million from Acorns, and Defendants stated that they "intend to continue our search for an initial Business Combination."

    C.      **Defendants Announce That The SPAC Will Dissolve
             But They Will Keep The Termination Fee For Themselves**

66.    By the end of 2022, Defendants had no deal in sight. On December 15, 2022, Defendants disclosed that the SPAC, having failed to identify a new transaction, would not "consummate an initial business combination within the time period required" and would dissolve.

67.    The SPAC's determination to dissolve triggered Acorn's obligation to pay the additional Termination Fee of $15 million, bringing the total payments to $32.5 million.

68.    Rather than distribute the Termination Fee to the SPAC's Class A public stockholders in the dissolution, Defendants stated that they planned to redeem the Class A Public Shares on January 13, 2023 and would return only the IPO proceeds held in the SPAC's trust account and "no other amounts."

69.    Instead, Defendants would distribute the entire Termination Fee (which had been diverted from the trust account and intentionally segregated) only to themselves as holders of Class B Founder Shares after the redemption of the Class A Public Shares.

70.    Defendants had the power and obligation to distribute (whether through a redemption, dividend, or otherwise) the Termination Fee to public stockholders, but simply chose not to do so, despite having agreed that they would have no "right, title, interest or claim of any kind in or to any monies held in the Trust Account *or any other asset of the [SPAC]* as a result of any liquidation." (Emphasis added.)

71.    Defendants' conduct is particularly egregious given that the Termination Fee was obtained only as a result of the SPAC's waiver of its rights to enforce the terms of the Transaction. While public stockholders gave up the value of the Transaction and any legal remedies, they purportedly received the value of the Termination Fee in exchange.

72.     If Defendants are permitted to simply pocket the Termination Fee, then the agreement to mutually terminate the Transaction was nothing more than a *disloyal scheme to exchange rights belonging to the SPAC and its public stockholders for personal financial benefits realized only by Defendants*.

73.     Defendants have no legal, equitable, fiduciary, contractual or other basis to misappropriate the Termination Fee. This Court should bar Defendants from distributing any of the SPAC's assets other than those held in the trust account until this action is resolved, and order Defendants to distribute the Termination Fee and any other remaining corporate assets to holders of Class A Public Shares.

## V.     CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this Action pursuant to Rule 23 of the Federal Rules of Civil Procedure individually and as a class action on behalf of all holders of Class A Public Shares on January 13, 2023 or otherwise on the date of Pioneer's redemption of the Public Shares (the "Class").

75.     The Class does not include Defendants named herein, and any person, firm, trust, corporation, or other entity related by blood or marriage to or affiliated or associated with any of the Defendants or their successors in interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the SPAC's shares are beneficially owned by thousands of geographically dispersed stockholders.

77.     There are questions of law and fact common to the Class, which predominate over questions affecting any individual Class member. These common questions include, *inter alia*:

- Whether the Termination Fee is a corporate asset of the SPAC and rightfully belongs to, and should be distributed to, holders of Class A Public Shares;

- Whether Defendants should be enjoined from distributing the Termination Fee or any other corporate assets of the SPAC to themselves;

- Whether Defendants breached their contractual and fiduciary duties to stockholders, and will be unjustly enriched, through their scheme to misappropriate the Termination Fee; and

- The existence and extent of injury to Plaintiff and the Class caused by such breaches, violations and misconduct.

78.    No difficulties are likely to be encountered in the management of this case as a class action.

79.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

80.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of other Class members and Plaintiff has the same interests as other Class members. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

81.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of

the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

82.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

## COUNT I

### Declaratory Judgment

83.     Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

84.     As set forth in detail above, pursuant to the Charter, Sponsor Agreement, and Defendants' public representations, Defendants have no right, claim or other entitlement to the Termination Fee or other remaining assets of the SPAC in connection with a dissolution. The Termination Fee is a corporate asset of the SPAC and rightfully belongs to, and should be distributed to, holders of Class A Public Shares.

85.     Plaintiff is entitled to a declaratory judgment that Defendants have no entitlement to the Termination Fee or any remaining assets of the SPAC, and that the Termination Fee must be distributed equitably to holders of Class A Public Shares.

86.     Plaintiff seeks all appropriate injunctive relief necessary to enforce the declaratory judgment entered by this Count. In the absence of such injunctive relief, stockholders will incur significant monetary and non-monetary harm.

## COUNT II

### Claim For Breach Of The Sponsor Agreement

87.    Plaintiff repeats and realleges all of the allegations set forth in the paragraphs above as if fully set forth herein.

88.    Each Defendant is a party to the Sponsor Agreement.

89.    Plaintiff and the Class are third-party beneficiaries of the Sponsor Agreement because the contract intended that public stockholders of the SPAC would benefit from its provisions, including the provisions at issue. Indeed, the Sponsor Agreement was executed in connection with, and enabled, the IPO—*i.e.*, the SPAC's effort to raise funds from public stockholders—and included a range of provisions protecting stockholders, including that Defendants would abide by the Charter and would not misappropriate the SPAC's assets in connection with a dissolution.

90.    The Sponsor Agreement does not disclaim third-party beneficiaries and Plaintiff is entitled to enforce the Sponsor Agreement on behalf of itself and the Class.

91.    The Sponsor Agreement provides that: "The Sponsor and each Insider [*i.e.*, the Defendants], with respect to itself, herself or himself, acknowledges that it, she or he has no right, title, interest or claim of any kind in or to any monies held in the Trust Account or any other asset of the Company as a result of any liquidation of the Company with respect to the Founder Shares held by it, her or him, if any."

92.    The SPAC's net assets, including the Termination Fee, are an amount payable "as a result of [a] liquidation" and thus Defendants disclaimed any entitlement to those assets, which must be distributed to Plaintiff and the Class.

93.     Defendants' stated intent to distribute the SPAC's net assets to themselves is a breach of the Sponsor Agreement.

94.     Defendants are personally liable to Plaintiff and the Class for the breach alleged herein.

## COUNT III

### Claim For Breach Of Fiduciary Duty

95.     Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

96.     Defendants owe fiduciary duties to Pioneer stockholders by virtue of their control of the SPAC and their positions as officers and/or directors of the SPAC.

97.     Defendants have breached their fiduciary duties by determining to appropriate the Termination Fee for themselves at the expense of public stockholders by distributing the assets exclusively to holders of Class B Founder Shares.

98.     Defendants are each self-interested in the distribution of the Termination Fee because each is a holder and/or has a direct financial interest in the Class B Founder Shares.

99.     Under the Sponsor Agreement, Defendants waived any entitlement to the SPAC's assets in a dissolution—as a necessary condition to raise public funds in the first place—and therefore there are no circumstances under which Defendants may make a claim on those assets. Indeed, Defendants repeatedly acknowledged through the SPAC's public filings that they would not be entitled to receive any payments in the event that they failed to complete a business combination and would lose their investments.

100.    Defendants have no legal, equitable or contractual entitlement, or business purpose, or any other legitimate reason, to appropriate the Termination Fee for their own benefit. They plan to do so solely to advance their own financial interests at the expense of the public stockholders.

101.    Defendants' actions are not entitled to business judgment protection because of their conflicting financial self-interests, and thus their decision must be weighed under the entire fairness standard. The contemplated distribution of assets is unfair on its face.

102.    This Court should enjoin Pioneer from distributing any of the SPAC's assets other than the IPO proceeds that are currently held in the SPAC's trust account. For the avoidance of doubt, this action does not seek to enjoin the distribution of the assets held in trust in connection with the redemption of Class A Public Shares.

103.    The Court should also order Defendants to equitably distribute the Termination Fee and other remaining assets of the SPAC to Plaintiff and the Class.

104.    In the absence of such injunctive relief, Plaintiff and the Class will incur significant monetary and non-monetary harm.

## COUNT IV

### Unjust Enrichment

105.    Plaintiff repeats and realleges all of the allegations set forth in the paragraphs above as if fully set forth herein.

106.    By their self-interested and wrongful acts, Defendants are attempting to unjustly enrich themselves at the expense of Plaintiff and the Class. Defendants have no legal or equitable entitlement to the Termination Fee and are attempting to divert those assets solely for their own personal benefit and to the detriment of public stockholders.

107.    This Count seeks the same injunctive relief against Defendants described above in Count II.

108.    Plaintiff and the Class have no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Declaring that this suit may proceed as a class action on behalf of the Class;

B.    Declaring that the Defendants are not entitled to the Termination Fee, and that the SPAC's net assets should be distributed equitably to Plaintiff and the Class;

C.    Declaring that the Defendants breached the Sponsor Agreement and their fiduciary duties and have unjustly enriched themselves to the detriment of public stockholders;

D.    Enjoining the distribution of the SPAC's net assets to Defendants and ordering Defendants to equitably distribute the assets to Plaintiff and the Class;

E.    Granting any additional extraordinary, equitable and injunctive relief against all Defendants to the fullest extent permitted by law and/or equity and consistent with the allegations above;

F.    In the alternative to the equitable relief set forth above, awarding Plaintiff and the Class damages, and pre-judgment and post-judgment interest, in an amount to be proven at trial;

G.    Awarding to Plaintiff the costs of the action, including reasonable attorneys' fees, accountants' fees, consultants' fees, and experts' fees, costs, and expenses; and

H.    Granting such further relief as the Court deems just and equitable.

Dated: December 30, 2022

/s/ Andrew Robertson
**MORRIS KANDINOV LLP**
Aaron T. Morris (5675178)
Andrew W. Robertson (4288882)
1740 Broadway, 15th Floor
New York, NY 10019
(877) 216-1552
aaron@moka.law
andrew@moka.law

**AFN LAW, PLLC**
Angus F. Ni (5208673)
506 2nd Ave., Suite 1400
Seattle, WA 98104
(646) 453-729

*Attorneys for Plaintiff*