## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FUNICULAR FUNDS, LP, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>PIONEER MERGER CORP., PIONEER MERGER SPONSOR LLC, JONATHAN CHRISTODORO, RICK GERSON, OSCAR SALAZAR, RYAN KHOURY, SCOTT CARPENTER, MATTHEW COREY, MITCHELL CAPLAN, and TODD DAVIS,<br><br>                    Defendants. | Civil Action No. 22-10986-JSR<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Funicular Funds, LP ("Plaintiff") alleges for its amended class action complaint against Pioneer Merger Corp. ("Pioneer" or the "SPAC"), Pioneer Merger Sponsor LLC (the "Sponsor"), Jonathan Christodoro, Rick Gerson, Oscar Salazar, Ryan Khoury, Scott Carpenter, Matthew Corey, Mitchell Caplan, and Todd Davis (together, the "Defendants") the following upon knowledge as to itself and its own actions, and upon information and belief as to all other matters.

## I.    INTRODUCTION

1.    This case involves the self-interested misappropriation of a $32.5 million corporate asset by the sponsor, officers and directors of a special purpose acquisition company (or SPAC).

2.    The SPAC, Pioneer, was formed by Alpha Wave Global, LP ("Alpha Wave") to acquire and take public a private company. Pioneer was operated by its Sponsor, an entity created and controlled by Alpha Wave, and the SPAC's officers and directors are each affiliated with Alpha Wave.

3.    Like a typical SPAC, Pioneer was structured to be a boom or bust proposition: the Defendants would either (i) own twenty percent of the post-acquisition company if Pioneer

successfully completed a business combination; or (ii) lose their entire investment if Pioneer failed to complete a business combination.

4.      Prior to raising money from the public, the SPAC issued millions of shares of Class B common stock ("Founder Shares") at less than a penny per share to the Sponsor and the SPAC's officers and directors. In order to support this arrangement and provide working capital, the Sponsor invested an additional $10.1 million through the purchase of warrants from the SPAC.

5.      In January 2021, the SPAC raised $402.5 million in an initial public offering ("IPO") that included the issuance of 40.25 million shares of Class A common stock ("Public Shares") to investors.

6.      The SPAC had two years to use the IPO proceeds to complete a business combination. If the SPAC successfully completed a business combination, then Defendants' Founder Shares would convert to Public Shares and be worth more than $100 million on paper. If, however, the SPAC failed to close a deal, then the SPAC's assets would be returned to investors, the Founder Shares and warrants would become worthless, and Defendants would lose the capital that they invested.

7.      That economic bargain—*i.e.*, the Sponsor's risk of a complete loss of its private investment in exchange for the prospect of a notional 10x return if the SPAC were to strike a deal—forms the heart of the SPAC model. Public stockholders of the SPAC relied upon this incentive structure to motivate the Sponsor to identify and close an attractive acquisition on the SPAC's behalf, and thus mitigate the risk that stockholders' capital would be tied up for the life of the SPAC with no significant returns.

8.      Defendants repeatedly acknowledged in public filings that they would lose their entire investment if the SPAC did not complete a business combination, and each Defendant

contractually agreed in connection with the IPO that they would have no "right, title, interest or claim of any kind in or to any monies held in the Trust Account *or any other asset of the [SPAC]* as a result of any liquidation" (*i.e.*, if the SPAC failed to make a deal). (Emphasis added.)

9.      In May 2021, Defendants announced a proposed transaction with Acorns Grow Incorporated ("Acorns"), a fast-growing wealth manager with a novel application to make investing and saving easier than traditional investment accounts (the "Transaction"). Upon information and belief, Defendant Christodoro—the Chairman of the SPAC's Board and President and Chief Investment Officer of an Alpha Wave affiliate—has a personal relationship with the Chief Executive Officer and Chief Investment Officer of Acorns, which stems from their days as fraternity brothers at Cornell University.

10.      By late 2021, however, Acorns was regretting the deal and its valuation of the company, and it appears that Acorns was already negotiating a private raise at a higher valuation in violation of the Transaction's no-shop provision.

11.      Rather than enforce the SPAC's right to require Acorns to close or pursue other legal remedies, the Defendants reached a deal with their friends at Acorns that would benefit both sides at the expense of public stockholders: Acorns would be permitted to slide out of the Transaction (and pursue private funding) in exchange for a cash break-up fee to the SPAC, which Defendants planned to divert to themselves.

12.      In January 2022, Defendants announced that the Transaction had been mutually terminated (the "Termination") and Acorns would pay a termination fee of up to $32.5 million— $17.5 million upfront and an additional $15 million if the SPAC were unable to identify a replacement transaction (the "Termination Fee"). At the time, Defendants subtly disclosed that the new funds would be kept outside of the SPAC's trust account, which was subject to distribution to

investors if the SPAC failed to complete a transaction, but did not specify who would receive the Termination Fee in a dissolution.

13.     Shortly thereafter, Acorns completed a private fundraising round at a higher pre-money valuation, demonstrating that public stockholders had been deprived of a Transaction with significant value.

14.     Following the Termination, Defendants—who planned to pocket the Termination Fee for themselves—had no incentive to identify a new deal and did not do so. In December 2022, they announced that the SPAC would dissolve, triggering the remaining $15 million Termination Fee payment from Acorns.

15.     Having failed to make a deal, Defendants were required by the SPAC's governing documents to take a loss and return the SPAC's assets to investors.

16.     Instead, they extracted a consolation prize: having diverted the $32.5 million Termination Fee to a separate account, Defendants chose to redeem outstanding Class A Public Shares in exchange for only the IPO proceeds held in the SPAC's trust account (with minimal interest less taxes). All remaining assets, including the Termination Fee, would be distributed solely to Defendants as holders of the Class B Founder Shares.

17.     The decision to abscond with the Termination Fee rendered the Termination a self-interested and disloyal transaction, given that Defendants caused the SPAC to sacrifice the deal with Acorns and its legal rights and remedies in exchange for a payment *that Defendants intended to misappropriate.*

18.     The SPAC has stated that it will not distribute its remaining assets, including the Termination Fee, until resolution of litigation. This action seeks an order of this Court requiring

Defendants to distribute the Termination Fee equitably to a class of holders of Class A Public Shares as of the date of the redemption.

## II.    THE PARTIES

19.    Plaintiff is a Delaware limited partnership and was, prior to the redemption, the largest disclosed holder of Class A Public Shares of Pioneer.

20.    Pioneer is a special purpose acquisition company, sometimes called a "blank check company," organized as a Cayman Islands exempted company. It was formed by Alpha Wave for the purpose of completing a business combination. Alpha Wave is a "diversified global alternative asset manager" operated by Defendants Gerson and Khoury.

21.    The Sponsor is a Cayman Islands limited liability company and was responsible for managing the SPAC. Alpha Wave formed the Sponsor and controls it through Defendant Gerson, Alpha Wave's Founder and Chairman.

22.    Defendant Christodoro is the Chairman of the SPAC's Board. He is the President and Chief Investment Officer of Patriot Global, an affiliate of Alpha Wave.

23.    Defendant Gerson is a Co-President of the SPAC. He is the Founder, Chairman and Chief Investment Officer of Alpha Wave.

24.    Defendant Salazar is a Co-President of the SPAC and a member of the SPAC's Board.

25.    Defendant Khoury is the SPAC's Chief Executive Officer. He is a co-Founder and Partner of Alpha Wave.

26.    Defendant Carpenter is the SPAC's Chief Operating Officer. He is the Chief Operating Officer of Alpha Wave.

27.     Defendant Corey is the SPAC's Chief Financial Officer. He is the Chief Financial Officer of Alpha Wave.

28.     Defendant Caplan is a member of the SPAC's Board.

29.     Defendant Davis is a member of the SPAC's Board.

### III.     JURISDICTION AND VENUE

30.     This Court has jurisdiction over this action under 28 U.S. Code § 1332(a) and (d).

31.     Venue is proper in this judicial district under 28 U.S.C. §1391(b)(1) and (2).

32.     This Court has jurisdiction over Defendants because each lists a business address of 660 Madison Avenue, New York, NY 10065 and Defendants transact a substantial amount of business in New York, have substantial ties to New York, and/or are citizens or residents of New York or otherwise maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

33.     In addition, the Sponsor Agreement (defined below), to which each Defendant is a party, states that "any action, proceeding, claim or dispute arising out of, or relating in any way to [the Sponsor Agreement] shall be brought and enforced in the courts of New York City, in the State of New York," and Defendants agreed to "irrevocably submit to such jurisdiction and venue, which jurisdiction and venue shall be exclusive" and "waive any objection to such exclusive jurisdiction and venue or that such courts represent an inconvenient forum."

### IV.     SUBSTANTIVE ALLEGATIONS

**A.     Alpha Wave Forms The Sponsor And
The SPAC To Complete A Business Combination**

34.     Alpha Wave (formerly known as Falcon Edge Capital) is a global alternative asset manager that offers investment products in different asset classes, themes, and geographies. It

manages approximately $17.0 billion across a range of private investment funds and separately managed accounts.

35.     In October 2020, Alpha Wave, in partnership with Patriot Global (an affiliate of Alpha Wave operated by Defendant Christodoro), formed the SPAC and the Sponsor for the purpose of completing a business combination with a "leading private company that is a potential industry disruptor or innovator in a growth market."

36.     The Sponsor is controlled by Defendant Gerson, its managing member and Alpha Wave's Founder and Chairman.

37.     The SPAC's capital structure consists of two classes of common stock: Class A Public Shares issued to the public through an IPO and Class B Founder Shares issued to Defendants for a nominal amount.

38.     The Class B Founder Shares were convertible to Class A Public Shares only in the event that the SPAC successfully completed a business combination. Otherwise, they would become worthless.

39.     On October 23, 2020, the Sponsor purchased 10,062,500 Class B Founder Shares for $25,000 (*i.e.*, less than one penny per share).

40.     On December 21, 2020, the Sponsor transferred 40,000 Founder Shares to each of Defendant Davis, Defendant Caplan, and Defendant Salazar (*i.e.*, the only officers and directors not directly affiliated with Alpha Wave).

41.     Thus, the SPAC's officers and directors (together, eight individuals) owned 100% of the outstanding Class B Founder Shares, and each had personal financial interests in the Founder Shares either directly as a holder or indirectly through affiliation with Alpha Wave.

7

42.     On January 12, 2021, Pioneer completed its initial public offering of 40,250,000 Class A Public Shares at $10.00 per share. Following the IPO, the Public Shares represented 80% of outstanding stock and the Founder Shares represented 20% of outstanding stock.

43.     In connection with the IPO, each of the Defendants entered into a letter agreement with the SPAC (the "Sponsor Agreement") pursuant to which they waived any entitlement under the Charter or otherwise to any assets of the SPAC in connection with a liquidation (*i.e.*, in the event that Defendants failed to complete a business combination).

44.     To provide working capital for the SPAC and induce Pioneer and the underwriter to enter into the Sponsor Agreement, the Sponsor invested $10.05 million in exchange for 6.7 million warrants issued by the SPAC in a private placement. The warrants were exercisable to purchase Class A Public Shares at $11.50 per share in the event of a business combination, and provided no other value or rights.

45.     The SPAC had two years from its IPO to complete a business combination or else it would be required to dissolve and distribute its assets back to investors.

46.     Defendants acknowledged that their Class B Founder Shares and the warrants issued to the Sponsor were structured to provide a profit to Defendants *only* if they were able to successfully complete a transaction for the SPAC.

47.     Indeed, Defendants expressly agreed in the Sponsor Agreement "that it, she or he has no right, title, interest or claim of any kind in or to any monies held in the Trust Account *or any other asset of the [SPAC]* as a result of any liquidation of the [SPAC] with respect to the Founder Shares held by it, her or him, if any." (Emphasis added.)

48.     The IPO prospectus also made clear that the "founder shares will be worthless if [Defendants] do not complete an initial business combination," "our warrants will expire worthless," and Defendants "will lose their entire investment."

49.     Further, in the SPAC's periodic filings thereafter, Defendants repeatedly reaffirmed that their "founder shares will be worthless if we do not complete an initial business combination" and "our warrants will expire worthless."

50.     Defendants had until January 12, 2023 to complete a business combination.

**B.      The SPAC Signs A Business Combination
        Agreement With Acorns, But The Deal Falls Through**

51.     On May 27, 2021, the SPAC announced that it had entered into a Business Combination Agreement (the "Transaction Agreement") with Acorns, a wealth manager that offers an application for simplified saving and investing. The Transaction provided a pre-money valuation of Acorns of $1.5 billion.

52.     Upon information and belief, Defendant Christodoro has a personal relationship with the Chief Executive Officer of Acorns, Noah Kerner, and the Chief Investment Officer, Seth Wunder, dating back to their days as fraternity brothers at Cornell University.

53.     After negotiating the deal with Acorns, Defendants touted the merits of the Transaction in press releases and presentations to investors.

54.     For example, in a September 2021 investor presentation, Defendants stated that Acorns (i) is "the largest subscription service in US consumer finance today with attractive, recurring revenues from a base of 4.3M sticky, engaged subscribers"; (ii) expects $120 million in annualized revenue for 2021; (iii) has "nearly 99% monthly retention" of users; (iv) operates at "80%+" gross margin; and (v) is "[p]ositioned to address the unmet needs of the largest consumer market in the world."

## Acorns Investment Highlights

**1** We believe Acorns is the largest subscription service in US consumer finance today with attractive, recurring revenues from a base of **4.3M sticky, engaged subscribers** with **nearly 99% monthly retention**[1], and **79% revenue growth in Q3**

**2** Category leader and creator in Financial Wellness, with differentiated marketing capabilities, product positioning and consumer trust with **NPS in the 93rd percentile**

**3** Positioned to address the unmet needs of the largest consumer market in the world: **everyday consumers, including 222M Americans**[2]

**4** Full-stack, scalable infrastructure with **gross margin rates currently above 80%+** and significant operating leverage, managed by an experienced leadership team with deep financial, tech, product and marketing expertise

**5** Opportunity for **meaningful ARPU expansion** through execution of long-term product roadmap to deliver a comprehensive money management solution for individuals and families

55.     The Transaction was expected to close in the second half of 2021 pending shareholder approval. However, upon information and belief, at some point in late 2021 Acorns began to second guess the agreement. It had apparently changed its mind about entering the public market at the negotiated price because of market conditions.

56.     Despite that the Transaction Agreement did not permit Acorns to "discuss, negotiate or knowingly facilitate, directly or indirectly, any inquiry, proposal or offer (written or oral) with respect to [another] Company Acquisition Proposal," it appears that Acorns began to negotiate, during this period, a new round of private equity as an alternative to raising capital through the Transaction with Pioneer.

57.     Upon information and belief, in or around the end of 2021, Acorns informed Defendants that it would not proceed with the Transaction.

C.      **Defendants Let Acorns Out Of The Deal In Exchange**
        **For A Termination Fee That Defendants Planned To Pocket**

58.      Upon learning that Acorns wanted out of the Transaction, Defendants had a range of legal tools available to them to protect the interests of public stockholders, including forcing Acorns to close pursuant to the terms of the Transaction.

59.      For example, the Transaction Agreement provided that "irreparable damage . . . would occur in the event that the [p]arties do not perform their respective obligations under the provisions of this Agreement (including failing to take such actions as are required of them hereunder to consummate the transactions contemplated by this Agreement)," and that the SPAC "shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement . . . in addition to any other remedy to which they are entitled at law or in equity."

60.      Acorns expressly agreed in the Transaction Agreement "that it *will not oppose the granting of an injunction, specific performance and other equitable relief* when expressly available pursuant to the terms of this Agreement on the basis that the other parties have an adequate remedy at law or an award of specific performance is not an appropriate remedy for any reason at law or equity." (Emphasis added.)

61.      Notwithstanding the SPAC's rights and remedies, Defendants decided to let Acorns off the hook. Upon information and belief, the former fraternity brothers—Defendant Christodoro, on behalf of Pioneer, and Mr. Kerner, on behalf of Acorns—negotiated a deal that would allow Acorns out of the Transaction and enable it to pursue its now-desired private funding (at a higher valuation) in exchange for a cash payment that the Defendants *intended from the outset to pocket for themselves* as the holders of Class B Founder Shares.

62.     On January 3, 2022, Defendants disclosed to investors the Termination and the Termination Fee Agreement pursuant to which "the parties agreed to mutually terminate [the] Business Combination Agreement."

63.     Acorns agreed to pay "an aggregate sum of $17,500,000 to the Company in monthly payments through December 15, 2022." Further, if the SPAC failed to complete "an initial business combination on or before December 15, 2022," then Acorns would "pay to the [SPAC] $15,000,000 no later than December 22, 2022."

64.     Thus, if the SPAC failed to complete a deal before its deadline, the Termination Fee from Acorns would total $32.5 million.

65.     In exchange for the Termination Fee, Pioneer agreed to release "all claims, actions, causes of action, demands and charges of whatever nature, known or unknown, arising out of, or relating to [the Transaction Agreement]" and also "not to bring any [r]eleased [c]laim before any court, arbitrator, or other tribunal in any jurisdiction"

66.     In the press release announcing the Termination, Defendants stated generally that if Pioneer does not complete a business combination, it will "redeem the Class A ordinary shares sold as part of the units in Pioneer's initial public offering, at a per-share price, payable in cash, *equal to the aggregate amount then on deposit in Pioneer's trust account* . . . divided by the number of the then-outstanding public shares of Pioneer, which redemption *will completely extinguish public shareholders' rights as shareholders (including the right to receive further liquidation distributions, if any)*." Thereafter, the SPAC would "liquidate and dissolve" with a distribution of remaining assets, if any, to the "remaining shareholders" (*i.e.*, Defendants, as holders of the Class B Founder Shares).

67.    What was not clearly disclosed at the time was that the Termination Fee would *not be deposited into the SPAC's trust account*, and thus would not be subject to distribution to public stockholders. Rather, Defendants planned from the outset to divert it into a separate account for distribution solely to themselves following the redemption of Class A Public Shares.

68.    On March 9, 2022, Acorns completed a private fundraising round, which excluded the SPAC, at a $1.6 billion pre-money valuation—$100 million more than the valuation agreed with Pioneer—suggesting that the SPAC and its public stockholders lost out on a potentially valuable deal.

69.    On March 30, 2022, Defendants disclosed their plan to divert the Termination Fee outside of the trust account. In a Form 10-K, Defendants stated that "if we do not complete an initial Business Combination, any funds remaining . . . from *payments under the Termination Fee Agreement, are expected to remain outside of the trust account* and not be part of liquidating distributions with respect to the public shares."

70.    While Defendants stated that they "intend[ed] to continue our search for an initial [b]usiness [c]ombination," finding a new deal was against their economic interests.

71.    They already had $17.5 million in their possession and $15 million more on the way so long as they avoided identifying a new transaction. The SPAC market was souring, and even if Defendants identified a potential acquisition target, they had no incentive to provide the deal to Pioneer rather than simply founding a new SPAC, given that they were already set to appropriate a profit from Pioneer regardless.

**D.    Defendants Announce That The SPAC Will Dissolve And They Will Keep The Termination Fee**

72.    On December 15, 2022, Defendants announced that the SPAC would not "consummate an initial business combination within the time period required" and would dissolve.

73.     The SPAC's determination to dissolve triggered Acorn's obligation to pay the additional Termination Fee of $15 million, bringing the total payment to $32.5 million, which was stashed away by Defendants outside of the SPAC's trust account.

74.     Defendants stated that, upon dissolution, the Class A Public Shares would be redeemed on January 13, 2023 and the SPAC would return to investors only the IPO proceeds held in the trust account with "no other amounts." The Termination Fee would be distributed, per Defendants' original plan, to themselves as holders of Class B Founder Shares after the redemption of the Class A Public Shares.

75.     Defendants had the power and obligation to distribute—whether through a redemption, dividend, or otherwise—the Termination Fee to public stockholders, but simply chose not to do so, despite having agreed in the Sponsor Agreement that they would have no "right, title, interest or claim of any kind in or to any monies held in the Trust Account *or any other asset of the [SPAC]* as a result of any liquidation." (Emphasis added.)

76.     Defendants' conduct is particularly egregious given that the *Termination Fee was obtained in exchange for the SPAC's waiver of its rights to enforce the terms of the Transaction*. While the SPAC and its public stockholders were forced to give up the value of the Transaction and any legal remedies, Defendants would pocket the monetary benefits of that waiver and effectively sold a corporate asset for their own profit.

77.     This rendered the Termination nothing more than a disloyal scheme to exchange rights belonging to the SPAC and its public stockholders for personal financial benefits realized solely by Defendants.

78.     On January 17, 2023, Defendants distributed the assets held in the SPAC's trust account to holders of Class A Public Shares, but retained all remaining assets, including the

Termination Fee. The SPAC has stated that it will not distribute any remaining assets, including the Termination Fee, until the resolution of this litigation.

79.     Defendants have no legal, equitable, fiduciary, contractual or other basis to misappropriate the Termination Fee, and this Court should order Defendants to distribute the Termination Fee and any other remaining corporate assets to holders of Class A Public Shares.

## V.     CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this Action pursuant to Rule 23 of the Federal Rules of Civil Procedure individually and as a class action on behalf of all holders of Class A Public Shares as of January 13, 2023 or otherwise on the date of Pioneer's redemption of the Public Shares (the "Class").

81.     The Class does not include Defendants named herein, and any person, firm, trust, corporation, or other entity related by blood or marriage to or affiliated or associated with any of the Defendants or their successors in interest.

82.     The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the SPAC's shares are beneficially owned by thousands of geographically dispersed stockholders.

83.     There are questions of law and fact common to the Class, which predominate over questions affecting any individual Class member. These common questions include, *inter alia*:

- Whether the Termination Fee is a corporate asset of the SPAC and rightfully belongs to, and should be distributed to, holders of Class A Public Shares;

- Whether Defendants breached their contractual and fiduciary duties to stockholders, and will be unjustly enriched, through their scheme to misappropriate the Termination Fee; and

•       The existence and extent of injury to Plaintiff and the Class caused by such breaches, violations and misconduct.

84.     No difficulties are likely to be encountered in the management of this case as a class action.

85.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

86.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of other Class members and Plaintiff has the same interests as other Class members. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

87.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

88.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

## COUNT I

### Declaratory Judgment

89.     Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

90.     As set forth in detail above, pursuant to the Charter, Sponsor Agreement, and Defendants' public representations, Defendants have no right, claim or other entitlement to the Termination Fee in connection with the SPAC's dissolution. The Termination Fee is a corporate asset of the SPAC and rightfully belongs to, and should be distributed to, holders of Class A Public Shares.

91.     Plaintiff is entitled to a declaratory judgment that Defendants have no entitlement to the Termination Fee and that the Termination Fee must be distributed equitably to holders of Class A Public Shares.

92.     Plaintiff seeks all appropriate injunctive relief necessary to enforce the declaratory judgment entered by this Count. In the absence of such injunctive relief, stockholders will incur significant monetary and non-monetary harm.

## COUNT II

### Claim For Breach Of The Sponsor Agreement

93.     Plaintiff repeats and realleges all of the allegations set forth in the paragraphs above as if fully set forth herein.

94.     Each Defendant is a party to the Sponsor Agreement.

95.     Plaintiff and the Class are third-party beneficiaries of the Sponsor Agreement because the contract intended that public stockholders of the SPAC would benefit from its

17

provisions, including the provisions at issue. Indeed, the Sponsor Agreement was executed in connection with, and enabled, the IPO—*i.e.*, the SPAC's effort to raise funds from public stockholders—and included a range of provisions protecting stockholders, including that Defendants would abide by the Charter and would not misappropriate the SPAC's assets in connection with a dissolution.

96.     The Sponsor Agreement does not disclaim third-party beneficiaries and Plaintiff is entitled to enforce the Sponsor Agreement on behalf of itself and the Class.

97.     The Sponsor Agreement provides that: "The Sponsor and each Insider [*i.e.*, the Defendants], with respect to itself, herself or himself, acknowledges that it, she or he has no right, title, interest or claim of any kind in or to any monies held in the Trust Account or any other asset of the Company as a result of any liquidation of the Company with respect to the Founder Shares held by it, her or him, if any."

98.     The Termination Fee is an amount payable "as a result of [a] liquidation" and thus Defendants disclaimed any entitlement to that asset, which must be distributed to Plaintiff and the Class.

99.     Defendants' intent to distribute the Termination Fee to themselves is a breach of the Sponsor Agreement.

100.     Defendants are personally liable to Plaintiff and the Class for the breach alleged herein.

## COUNT III

### Claim For Breach Of Fiduciary Duty

101.     Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

102.    Defendants owe fiduciary duties to Pioneer stockholders by virtue of their control of the SPAC and their positions as officers and/or directors of the SPAC.

103.    Defendants breached their fiduciary duties by intentionally negotiating the Termination, and waiving the SPAC's rights and claims with respect to the Transaction, in exchange for the Termination Fee which Defendants planned to appropriate for themselves as the holders of Class B Founder Shares.

104.    Defendants are each self-interested in the Termination and the distribution of the Termination Fee because each is a holder and/or has a direct financial interest in the Class B Founder Shares. Each participated in this concerted scheme to exchange corporate rights and assets for monetary benefits solely to themselves.

105.    Under the Sponsor Agreement, Defendants waived any entitlement to the SPAC's assets in a dissolution—as a necessary condition to raise public funds in the first place—and therefore there are no circumstances under which Defendants may make a claim on those assets. Indeed, Defendants repeatedly acknowledged through the SPAC's public filings that they would not be entitled to receive any payments if they failed to complete a business combination and would lose their entire investments.

106.    Defendants have no legal, equitable or contractual entitlement, or business purpose, or any other legitimate reason, to appropriate the Termination Fee for their own benefit. They plan to do so solely to advance their own financial interests at the expense of the public stockholders.

107.    Defendants' actions are not entitled to business judgment protection because of their conflicting financial self-interests, and thus their decision must be weighed under the entire fairness standard. The contemplated distribution of assets is unfair on its face.

19

108.    The Court should order Defendants to equitably distribute the Termination Fee and any other remaining assets of the SPAC to Plaintiff and the Class.

109.    In the absence of such injunctive relief, Plaintiff and the Class will incur significant monetary and non-monetary harm.

## COUNT IV

### Unjust Enrichment

110.    Plaintiff repeats and realleges all of the allegations set forth in the paragraphs above as if fully set forth herein.

111.    By their self-interested and wrongful acts, Defendants are attempting to unjustly enrich themselves at the expense of Plaintiff and the Class.

112.    Defendants have no legal or equitable entitlement to the Termination Fee and are attempting to divert that asset solely for their own unjust personal benefit and to the detriment of public stockholders.

113.    This Count seeks the same injunctive relief against Defendants described above in Count II.

114.    Plaintiff and the Class have no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Declaring that this suit may proceed as a class action on behalf of the Class;

B.    Declaring that the Termination Fee must be distributed equitably to Plaintiff and the Class;

C.    Declaring that the Defendants breached the Sponsor Agreement and their fiduciary duties and have unjustly enriched themselves to the detriment of Plaintiff and the Class;

D.      Ordering Defendants to equitably distribute the Termination Fee to Plaintiff and the Class;

E.      Granting any additional extraordinary, equitable and injunctive relief against all Defendants to the fullest extent permitted by law and/or equity and consistent with the allegations above;

F.      In the alternative to the equitable relief set forth above, awarding Plaintiff and the Class damages, and pre-judgment and post-judgment interest, in an amount to be proven at trial;

G.      Awarding to Plaintiff the costs of the action, including reasonable attorneys' fees, accountants' fees, consultants' fees, and experts' fees, costs, and expenses; and

H.      Granting such further relief as the Court deems just and equitable.

Dated: January 20, 2023

/s/ Aaron T. Morris
**MORRIS KANDINOV LLP**
Aaron T. Morris (5675178)
Andrew W. Robertson (4288882)
1740 Broadway, 15th Floor
New York, NY 10019
(877) 216-1552
aaron@moka.law
andrew@moka.law

**AFN LAW, PLLC**
Angus F. Ni (5208673)
506 2nd Ave., Suite 1400
Seattle, WA 98104
(646) 453-729

*Attorneys for Plaintiff*