# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FUNICULAR FUNDS, LP, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>        v.<br><br>PIONEER MERGER CORP., PIONEER MERGER SPONSOR LLC, JONATHAN CHRISTODORO, RICK GERSON, OSCAR SALAZAR, RYAN KHOURY, SCOTT CARPENTER, MATTHEW COREY, MITCHELL CAPLAN, and TODD DAVIS,<br><br>            Defendants. | Civil Action No. 22-10986-JSR<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO <u>DISMISS OR TO STAY THE ACTION</u>** |

**MORRIS KANDINOV LLP**
Aaron T. Morris
Andrew W. Robertson
1740 Broadway, 15th Floor
New York, NY 10019
(877) 216-1552

**AFN LAW, PLLC**
Angus F. Ni
506 2nd Ave., Suite 1400
Seattle, WA 98104
(646) 453-7294

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................iv

PRELIMINARY STATEMENT .................................................................................................1

FACTUAL BACKGROUND .....................................................................................................4

A.     The SPAC And The Parties ...........................................................................................4

B.     Defendants Solicit Money From Public
Stockholders to Pursue a Business Combination ................................................5

C.     Defendants Agree To Be Compensated
Only If A Business Combination Is Achieved ....................................................6

D.     Defendants Each Choose New York As The
Exclusive Forum For Litigation Concerning The SPAC ....................................7

E.     Defendants Negotiate A Transaction For The SPAC, But Allow
The Target To Back Out To Advance Their Own Financial Interests ................8

F.     Plaintiff Files This Action And A Winding Up Proceeding to Protect
Class A Stockholders And Ensure Recovery Of The Termination Fee ............9

ARGUMENT .............................................................................................................................11

I.     THE CAYMAN ACTION PROVIDES NO
BASIS TO DISMISS OR STAY THIS ACTION.............................................................11

     A.     Every Defendant Contractually Agreed To
Resolve The Merits Of This Action In New York .................................................11

     B.     *Forum Non Conveniens* Does Not Support Dismissal .........................................12

          1.     The Court Must Defer To The Forum Selection Clause ...........................12

          2.     Defendants' *Forum Non Conveniens* Arguments Are Baseless................13

          3.     Defendants' Various Remaining Jurisdictional Arguments All Fail........14

II.     DEFENDANTS' MOTION TO DISMISS PURSUANT TO
FED. R. CIV. P. 12(B)(6) LIKEWISE SHOULD BE DENIED.....................................17

     A.     Pleading Standard ...................................................................................................17

     B.     Plaintiff Has Sufficiently Pled Third-Party
Standing To Enforce The Sponsor Agreement.......................................................17

1.   Plaintiff And The Class Are The Intended
     Beneficiaries Of The Sponsor Agreement.................................................17

2.   The Case Law Cited By Defendants Does Not Suggest Otherwise..........19

3.   Defendants Cannot Rewrite the Sponsor
     Agreement Or Avoid Their Obligations Under It ....................................21

C.   Plaintiff Has Sufficiently Pled A Direct
     Claim For Breach Of Fiduciary Duties ................................................................22

CONCLUSION ............................................................................................................25

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*Aenergy, S.A. v. Republic of Angola*,
    No. 20 Civ 3569, 2021 WL 1998725 (S.D.N.Y. May 19, 2021) ......................................... 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................................. 17

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................. 17

*BFI Group. Divino Corp. v. JSC Russian Aluminum*,
    298 F. App'x 87 (2d Cir. 2008) .................................................................................. 14

*Burns Jackson Miller Summit & Spitzer v. Lindner*,
    59 N.Y.2d 314 (1983) ................................................................................................ 19

*In re CIL, Ltd.*,
    No. 18 Civ 2226 (JSR), 2018 WL 2383102 (S.D.N.Y. May 4, 2018) ........................... 23-24

*Consolidated Edison v. Northeast Utilities*,
    426 F.3d 524 (2d Cir. 2005) ...................................................................................... 21

*Dormitory Authority of the State of New York v. Samson Construction Co.*,
    30 N.Y.3d 704 (2018) ................................................................................................ 21

*Evolution Online Systems, Inc. v. Koninklijke Nederland N.V.*,
    41 F. Supp. 2d 447 (S.D.N.Y. 1999) .......................................................................... 16

*Fasano v. Yu Yu*,
    921 F.3d 333 (2d Cir. 2019) ..................................................................................... 12-13

*First Solar, Inc. v. Absolute Process Instruments, Inc.*,
    No. 17-cv-8518 (JSR), 2018 WL 1166632 (S.D.N.Y. Feb. 8, 2018) ............................... 17

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*,
    66 N.Y.2d 38 (1985) ................................................................................................. 18-20

*In re Herald*,
    540 F. App'x 19 (2d Cir. 2013) ................................................................................. 16

*Internationale Nederlanden (U.S.) Capital Corporation v. Bankers Trust Co.*,
    261 A.D.2d 117 (N.Y. App. Div. 1999) ....................................................................... 10

*Iragorri v. United Techs. Corp.*,
    274 F.3d 65 (2d Cir. 2001) ................................................................................. 13

*Maersk Line A/S v. Carew*,
    588 F. Supp. 3d 493 (S.D.N.Y. 2022) ............................................................12-13

*Nanopierce Techs., Inc. v. Southridge Cap. Management*,
    No. 02 Civ 0767, 2008 WL 250553 (S.D.N.Y. Jan. 29, 2008) ............................ 17

*Newin Corp. v. Hartford Accident & Indemnity Co.*,
    37 N.Y.2d 211 (1975) ......................................................................................... 21

*Saint Christopher's, Inc. v. JMP Acquisitions, LLC*,
    No. 20-3808, 2021 WL 6122674 (2d Cir. Dec. 28, 2021) .................................... 22

*In re Salomon Smith Barney Mutual Fund Fees Litigation*,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006) .................................................................. 25

*Santos v. Costa Cruise Lines, Inc.*,
    91 F. Supp. 3d 372 (E.D.N.Y. 2015) ................................................................... 13

*Subaru Distributors v. Subaru of America*,
    425 F.3d 119 (2d Cir. 2005) ................................................................................ 19

*Vector Media, LLC v. Golden Touch Transportation of NY, Inc.*,
    189 A.D.3d 654 (1st Dept. 2020) ........................................................................ 22

## **Statutes and Rules**                                   **Page(s)**

Fed. R. Civ. P. 8(a) ..................................................................................................... 17

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 17

Fed. R. Civ. P. 23 ......................................................................................................... 4

Fed. R. Civ. P. 15(a)(2) .............................................................................................. 25

## **Other Authorities**                                   **Page(s)**

Restatement (2d) of Contracts, § 302 ...................................................................18-20

## PRELIMINARY STATEMENT

This case presents an egregious example of corporate fiduciaries succumbing to their own personal financial interests in breach of their duties and contractual representations to stockholders. Pioneer Merger Corp. ("Pioneer" or the "SPAC") is a special purpose acquisition company controlled by Pioneer Merger Sponsor LLC (the "Sponsor") and its officers and directors (together with the Sponsor, the "Defendants"). Defendants raised money from public stockholders through an IPO premised on their experience and expertise in identifying a valuable company for the SPAC to merge with. They had two years to arrange a deal or else the SPAC would liquidate and return its assets to stockholders. In the event of a liquidation, Defendants acknowledged that they would lose their entire investments and expressly waived entitlement to any "asset of the [SPAC] as a result of any liquidation."

Five months after the IPO, Defendants announced a transaction with Acorns Grow Incorporated ("Acorns"), a fast-growing and innovative wealth manager (the "Transaction"). The Transaction was expected to close in the second half of 2021, but at some point in late 2021 Acorns advised Pioneer that it wanted out, and Defendants obliged. In January 2022, rather than enforce the terms of the bargain, Defendants caused the SPAC to agree to mutually terminate the Transaction in exchange for a fee of $32.5 million, $15 million of which was contingent on the SPAC failing to identify a replacement transaction (the "Termination Fee"). Having secured the Termination Fee (and secretly determined to keep it for themselves), Defendants had little incentive to identify a new transaction and never did so. Instead, in December 2022, Defendants announced that the SPAC would liquidate and dissolve.

Rather than distribute the SPAC's corporate assets, including the Termination Fee, to its public stockholders, who hold Class A common stock, Defendants devised a scheme to divert the assets to themselves. They segregated the Termination Fee from the IPO proceeds, which would

be returned to investors, and announced that all Class A stockholders would be redeemed before the distribution of the SPAC's remaining assets. Thereafter, the Defendants, who hold Class B common stock, would be the only remaining stockholders and would be free to distribute all of the remaining assets, including the Termination Fee, to themselves, despite having agreed before the IPO *not to do this exact thing*.

Plaintiff filed this litigation immediately thereafter as well as a winding up proceeding in the Cayman Islands, which had the legal effect of subjecting any subsequent disposition of the company's property, transfer of its shares, or alteration of the status of its members to retrospective invalidation following the appointment of a third-party liquidator. Nonetheless, Defendants *proceeded with the redemption of the Class A stock anyway* and would have proceeded with the distribution of assets to themselves but for Plaintiff's efforts in this action. Defendants have now stated that they will not distribute any additional assets until the litigation resolves.

Defendants do not dispute most, if any, of the facts above. Rather, with little to say about the facts, they argue procedure, but their contentions do not support dismissal of this action.

First, this action should not be dismissed in light of the Cayman Islands winding up proceeding because the cases are not duplicative and each Defendant agreed in connection with the IPO that New York would be the "exclusive forum" for actions relating to the Sponsor Agreement. Defendants allocate nearly 10-pages to *forum non conveniens* arguments that simply ignore the valid and binding forum selection clause in the Sponsor Agreement, which Defendants never bother to mention. In so doing, Defendants ask this Court to apply the wrong legal standard in determining whether to keep the case. The forum selection clause is dispositive as to all jurisdictional arguments, and even if it were not, every relevant factor suggests that New York is the appropriate forum: the Sponsor Agreement selects New York law; all Defendants list a

business address in New York; the SPAC's IPO was conducted by a New York underwriter and targeted to U.S. investors for the purpose of making a U.S. acquisition; the SPAC's shares traded on NASDAQ in New York; no parties or witnesses reside in the Cayman Islands; and there are otherwise no connections to the Cayman Islands other than the registration of the SPAC entity. Defendants' scattershot arguments about "forum shopping," among other things, are baseless and change nothing about the above.

Second, Plaintiff has sufficiently alleged third-party standing to enforce the Sponsor Agreement because Class A stockholders are effectively the *only beneficiaries* of Defendants' agreement not to appropriate the SPAC's assets in a liquidation. No other party stands to directly benefit from that provision, and thus no other party will enforce it. These circumstances satisfy the legal standard under *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 44 (1985) for third-party enforcement of a contract, and Defendants' various arguments on the margins rely on inapplicable cases that do not support their arguments in any event. As to the breach itself, Defendants halfheartedly argue that stockholders are entitled to "nothing more" than the Trust Account, but even if that were true (and it is not), Defendants intentionally segregated the Termination Fee for the purpose of distributing it to themselves. That self-interested action does not somehow excuse Defendants from the restrictions in the Sponsor Agreement or, inversely, deprive Class A stockholders of their right to the assets.

Third, Plaintiff has standing to assert fiduciary claims directly against Defendants. Cayman Islands law permits direct claims for breach of fiduciary duty where the relationship between stockholders and their fiduciaries is sufficiently akin to a typical agency relationship. Such is the case here under the unique structure of a SPAC. Defendants solicited public investment based on their personal business acumen in identifying a valuable transaction (there were no other business

operations), and stockholders trusted Defendants to exercise the skill and diligence necessary to complete that task (or, at a minimum, not to steal the money). Defendants violated that trust by utilizing their control over the SPAC to divert for themselves assets that belong to, and should have been distributed to, Class A stockholders. The injury caused by that breach was incurred *directly and exclusively* by stockholders (not the SPAC), and therefore gives rise to a direct claim.

For the reasons set forth above, Defendants' Motion should be denied, except with respect to the unjust enrichment claim, which Plaintiff agrees to dismiss without prejudice in light of Defendants' agreement not to distribute the disputed assets during the pendency of this litigation.

## **FACTUAL BACKGROUND**[1]

### A.   **The SPAC And The Parties**

Pioneer is a special purpose acquisition company formed to acquire a private business. (¶ 35.)[2] Plaintiff is the largest disclosed holder of Class A common stock ("Class A" or "Public Shares") of the SPAC. (¶ 19.) This action is brought pursuant to Fed. R. Civ. P. 23 on behalf of a proposed class of all Class A stockholders who held Public Shares as of the date of the redemption of those shares, as discussed below. (¶ 80.)

The SPAC and the Sponsor were created by Alpha Wave Global, LP ("Alpha Wave"), a global asset manager, in October 2020. (¶ 33.) Both entities are controlled by Alpha Wave personnel and affiliates: (i) the Sponsor is controlled by Defendant Gerson, its managing member

---

[1]   The facts set forth herein are derived from Plaintiff's Amended Class Action Complaint (ECF 9) (the "Amended Complaint"), as well as the final prospectus filed by the SPAC in connection with its initial public offering (the "IPO Prospectus") and the letter agreement between the Defendants and the SPAC (the "Sponsor Agreement"), which are integral to the Complaint. The IPO Prospectus is attached as Exhibit A to the Declaration of Aaron Morris ("Morris Dec."), filed herewith, and the Sponsor Agreement is attached as Exhibit B.

[2]   Citations in the form "¶ __" are to the Amended Complaint.

and Alpha Wave's Founder and Chairman (¶ 35); and (ii) the SPAC's officers and directors, with only two exceptions, are all employees or affiliates of Alpha Wave (¶¶ 21-28).

Alpha Wave, the SPAC, and the Sponsor all maintain their principal offices in New York City, and the individual Defendants list a business address in New York City. (¶ 32; *see also* IPO Prospectus, Morris Dec. Ex. A at 10 ("Our executive offices are located at 660 Madison Avenue, New York, NY 10065."); *id.* at 118 ("[T]he business address of each of our shareholders [including the Sponsor and Defendants Gerson, Salazar, Davis, and Caplan] is 660 Madison Avenue, New York, NY 10065.").)

## B.    Defendants Solicit Money From Public Stockholders To Pursue A Business Combination

The SPAC completed its IPO on January 12, 2021, generating proceeds of more than $400 million by issuing 40,250,000 Class A shares at $10 per share to the investing public. (¶ 42.) The proceeds of the IPO were held in a trust account (the "Trust Account") on behalf of Class A stockholders pending completion of a business combination. (¶ 47.) The SPAC had two years from its IPO to complete a business combination, and if it failed to do so, it would be required to return the SPAC's assets to Class A stockholders. (¶ 45.)

The SPAC's only operational goal was to complete a business combination, and Alpha Wave, through the Sponsor, was responsible for leading the search to identify a suitable company for the SPAC to acquire. (¶¶ 20, 35; *see also* IPO Prospectus, Morris Dec. Ex. A at 5 ("We will seek to capitalize on [the Sponsor's] experience and capabilities through the leadership of [Defendants] Jonathan Christodoro, Rick Gerson, Oscar Salazar and Ryan Khoury, combined with the expertise of the other members of our management team and board of directors, in consummating our initial business combination."); *id.* at 2-5 (detailing the qualifications and experience of the Sponsor and its senior management).)

**C.     Defendants Agree To Be Compensated
          <u>Only If A Business Combination Is Achieved</u>**

Prior to the IPO, Defendants caused the SPAC to issue a separate series of stock, 10,062,500 Class B common shares ("Class B" or "Founder Shares") to the Sponsor for $25,000—*i.e.*, less than one penny per share. (¶ 38.) The Sponsor then transferred 40,000 Class B shares to each of Defendants Davis, Caplan, and Salazar. (¶ 40.) As a result, each of the SPAC's officers and directors—Defendants in this case—had financial interests in the Class B Founder Shares either directly or indirectly through the Sponsor. (¶ 41.)

If the SPAC completed a business combination, the Class B Founder Shares were convertible into Class A Public Shares, and thus would become both liquid and valuable. (¶ 38.) If no business combination was completed, the Class B shares would expire worthless. (*Id.*) Thus, Class B shares provided a means for the Sponsor and the SPAC's officers and directors to participate in the profits of a successful business combination, but they would receive nothing if they failed to complete a transaction. (¶ 46.) To provide the SPAC with working capital for the search, the Sponsor also invested $10.05 million in exchange for 6.7 million warrants issued by the SPAC in a private placement. (¶ 44.) The warrants could be exercised for the right to purchase Class A shares at $11.50 per share in the event of a business combination, but they would also become worthless if no business combination was completed. (*Id.*)

Defendants' economic bargain in launching the SPAC—*i.e.*, that it would make a deal and profit or fail to make a deal and lose its investment—was typical, uncomplicated, and repeatedly disclosed to investors in the IPO Prospectus:

- "The founder shares will be worthless if we do not complete an initial business combination." (Morris Dec. Ex A at 51.)

- "If we do not complete our initial business combination within 24 months from the closing of this offering, the private placement warrants will expire worthless." (*Id.* at 18.)

- "[O]ur sponsor, executive officers and directors will lose their entire investment in us if our initial business combination is not completed (other than with respect to public shares they may acquire during or after this offering)." (*Id.* at 51.)

Consistent with this arrangement, the IPO Prospectus told investors that the holders of the Class B Founder Shares and warrants (*i.e.*, the Defendants) would not be entitled to receive any liquidating distributions in the event the SPAC failed to complete a business combination. (*Id.* At 26.) Indeed, prior to the IPO, each of the Defendants signed the Sponsor Agreement, which defined their rights—or, in this case, their *lack of rights*—with respect to the SPAC's assets. (¶ 43.) In particular, each Defendant expressly "acknowledge[d] that it, she or he has no right, title, interest or claim of any kind in or to any monies held in the Trust Account or any other asset of the Company as a result of any liquidation of the Company with respect to the Founder Shares held by it, her or him, if any." (Morris Dec. Ex. B at § 4(b).)

## D. Defendants Each Choose New York As The Exclusive Forum For Litigation Concerning The SPAC

When the Defendants negotiated and signed the Sponsor Agreement with the SPAC, they included a choice of law provision specifying that the agreement "shall be governed by and constructed and enforced in accordance with the laws of the State of New York," as well as a broad and comprehensive forum selection provision specifying that "any action, proceeding, claim or dispute arising out of, or relating in any way to, this [Sponsor] Agreement shall be brought and enforced in the courts of New York City." (*Id.* § 17.) As part of the latter, each Defendants "irrevocably submit[ted] to such jurisdiction and venue, which . . . shall be exclusive" and "waive[d] any objection to such exclusive jurisdiction and venue or that such courts represent an inconvenient forum." *Id.*

**E.    Defendants Negotiate A Transaction For The SPAC, But Allow
The Target To Back Out To Advance Their Own Financial Interests**

On May 27, 2021, the SPAC announced that it had entered into a Business Combination
Agreement (the "Transaction Agreement") with Acorns, a wealth manager that offers an
application for simplified saving and investing. (¶ 51.) Defendants publicly touted Acorns'
business prospects and the value of the Transaction, which was expected to close in the second
half of 2021 but, in late 2021, Acorns informed Defendants that it did not plan to proceed with the
Transaction. (¶¶ 55, 57.) Rather than force Acorns to close pursuant to the terms of the Transaction
Agreement, Defendants chose to let Acorns off the hook and to seek financial benefits for
themselves in exchange for allowing Acorn to escape its obligations under the Transaction
Agreement. (¶¶ 58-61.)

On January 3, 2022, Defendants disclosed that the SPAC had entered into a Termination
Fee Agreement with Acorns, pursuant to which the parties agreed to terminate the Transaction
Agreement. (¶ 62.) Under the agreement, the SPAC agreed to release its rights to enforce the
Transaction Agreement or seek damages for Acorns' breach of that agreement. (¶ 65.) In exchange,
Acorns agreed to pay "an aggregate sum of $17,500,00 to the Company in monthly payments
through December 15, 2022, plus an additional payment of $15,000,000 if the SPAC failed to
complete a business combination by December 15, 2022." (¶ 63.) Thus, if—as ultimately came to
pass—the SPAC failed to complete a business combination by the deadline, it would receive a
total Termination Fee of $32.5 million from Acorns. (¶¶ 64, 70-72.)

Having leveraged a release and waiver of the SPAC's legal rights to obtain the Termination
Fee, Defendants then undertook to procure the $32.5 million Termination Fee for themselves rather
than distribute any portion to the SPAC's Class A stockholders. (¶¶ 74-75.) Defendants determined
not to deposit the Termination Fee into the SPAC's Trust Account, which Defendants concede

must be distributed in its entirety to Class A stockholders. (¶ 67.) Instead, Defendants isolated the Termination Fee in a separate account and, following the redemption of all Class A stockholders, planned to distribute the $32.5 million to themselves (¶ 69), notwithstanding their unambiguous acknowledgement in the Sponsor Agreement that they have no right to "any monies held in the Trust Account *or any other asset of the Company* as a result of any liquidation of the Company." (Morris Dec. Ex. B § 4(b) (emphasis added).)

On December 15, 2022, Defendants announced to investors that the SPAC had failed to identify an alternative business combination and would dissolve. (¶ 72.) Defendants stated that Class A shares would be redeemed on January 13, 2023, returning to investors only the IPO proceeds held in the Trust Account with "no other amounts." (¶ 74.) The SPAC's remaining assets—largely consisting of the Termination Fee—would be distributed to Defendants as the remaining stockholders.

**F.     Plaintiff Files This Action And A Winding Up Proceeding to Protect
         Class A Stockholders And Ensure Recovery Of The Termination Fee**

On December 30, 2022, before the anticipated redemption of Class A shares, Plaintiff filed this action, which asserts claims against Defendants arising from their efforts to abscond with the Termination Fee and seeks the distribution of the Termination Fee for the exclusive benefit of Class A stockholders (the only stockholders entitled to receive the SPAC's assets in a liquidation). Plaintiff filed the action in this District pursuant to the unambiguous forum selection provision in the Sponsor Agreement, to which all Defendants are signatories. (¶ 33; *see also* Morris Dec. Ex. B at § 17.)

On January 12, 2023, Plaintiff filed a winding up petition with the Financial Services Division of the Grand Court of the Cayman Islands (the "Petition"). Though it arises from the same facts as this action, the Petition seeks to institute a distinct proceeding with a narrow and different

purpose. Under Cayman law, the filing of a winding up petition operates to render certain corporate actions, including the cancellation and/or redemption of equity interests, voidable from the date of the Petition. (Declaration of Mark Goodman ("Goodman Dec."), filed herewith, at ¶ 3.) Such actions are automatically void upon a winding up order, unless previously approved by a Cayman Islands court. (*Id.*) Institution of the proceeding (which Defendants do not now oppose) will result in the retrospective voiding of all such corporate actions and the SPAC's winding up being overseen by independent liquidators rather than by Defendants or their own liquidators. (*Id.*)

Before filing the Petition, Plaintiff demanded that Defendants "immediately pay the Break Fee into the [SPAC's] Trust Account" so that the sum would be distributed to public stockholders through the redemption, which could obviate the need for the "recently commenced litigation in the southern district of New York." (*Id.* ¶ 4.) Defendants ignored the demand and Plaintiff filed the Petition, after which Defendants proceeded with the purported redemption anyway and distributed the assets in the Trust Account to Class A stockholders. (*Id.* ¶¶ 5-6.) Immediately thereafter, Defendants requested that Plaintiff agree to an ex post facto validation of the redemption, which Plaintiff refused. (*Id.*)

To avoid injunction briefing in this action with respect to the Termination Fee, Defendants subsequently agreed not to distribute the Termination Fee during litigation and stated in a letter from counsel: "[as] discussed between our clients' respective New York Counsel, the board of the SPAC has determined not to make any distribution of the net remaining proceeds of the Break Fee [*i.e.*, the Termination Fee] to the shareholders (or former shareholders) of the SPAC, pending resolution of the broader dispute." (*Id.* ¶ 7.)

While the parties to the winding up proceeding are contesting various Cayman Islands law matters relating to the Petition (namely seeking court approval of the purported redemption of the

Class A shares under Cayman Islands law), these legal issues do not address the merits of this case, which will be decided by this Court. (¶¶ 7-8.) If the winding up action is permitted to proceed, then the appointed liquidators may stay the distribution of assets until a judgment of this Court, including with respect to the Sponsor Agreement. (*Id.* ¶¶ 9-10.)

## ARGUMENT

### I.  THE CAYMAN ACTION PROVIDES NO BASIS TO DISMISS OR STAY THIS ACTION

#### A.  Every Defendant Contractually Agreed To Resolve The Merits Of This Action In New York

The Sponsor Agreement, to which each Defendant is a party, selects a New York forum for all disputes relating to the SPAC and Sponsor, and each Defendant:

- agreed that "any action, proceeding, claim or dispute arising out of, *or relating in any way to*, this [Sponsor] Agreement shall be brought and enforced in the courts of New York City";

- submitted "irrevocably . . . to such jurisdiction and venue, which jurisdiction and venue *shall be exclusive*"; and

- waived "an*y objection to such exclusive jurisdiction* and venue or that such courts represent an *inconvenient forum*."

(¶ 33 (emphasis added); *see also* Morris Dec. Ex. B at § 17.)[3] These contractual agreements are dispositive as to every jurisdictional argument in the Motion: Defendants expressly designated New York as the exclusive forum and waived any potential arguments to the contrary. The SPAC's Articles of Association do not include a forum selection clause for the Cayman Islands, and no other basis exists to challenge New York as the exclusive forum.

---

[3] Defendants likewise agreed to a New York forum selection clause in an ancillary agreement relating to warrants issued by the SPAC, further demonstrating their contractual intent to have disputes resolved in this forum.

Defendants neglected entirely to advise the Court of this binding contractual jurisdiction provision, and all jurisdictional arguments in the Motion should be rejected on this independently dispositive ground. Having agreed to "waive any objection . . . that [New York] courts represent an inconvenient forum" (¶ 33), Defendants are barred from now arguing that the "convenience factors weigh against a finding that New York is a convenient forum." (MTD at 9.)

**B.**     ***Forum Non Conveniens* Does Not Support Dismissal**

Even if Defendants had not contractually agreed to "waive any objection to [New York] exclusive jurisdiction," including that New York is "an inconvenient forum," Defendants still would have no basis to resist New York as the proper forum. In their Motion, they have directed the Court to the *wrong legal standard* and, under any legal standard, all relevant factors support jurisdiction in New York.

**1.     The Court Must Defer To The Forum Selection Clause**

"Where the parties have contractually selected a forum . . . the forum selection clause substantially modifies the *forum non conveniens* doctrine and the usual tilt in favor of the plaintiff's choice of forum gives way to a presumption in favor of the contractually selected forum." *Fasano v. Yu Yu*, 921 F.3d 333, 335 (2d Cir. 2019) (finding that "district court abused its discretion in not considering the forum selection clause and its impact, if any, on the *forum non conveniens* analysis"). "If a plaintiff sues in the agreed-upon forum, a defendant's assent to that forum selection clause waives the right to challenge the preselected forum as inconvenient." *Maersk Line A/S v. Carew*, 588 F. Supp. 3d 493, 505 (S.D.N.Y. 2022).

This Court "must consider three factors in determining whether the presumption of enforceability applies to a forum selection clause: whether (1) the clause was reasonably communicated to the party resisting its enforcement; (2) the clause is mandatory or permissive; and (3) the claims and parties to the dispute are subject to the clause"—none of which is disputed

(or even addressed) by Defendants. *See id.; see also Santos v. Costa Cruise Lines, Inc*., 91 F. Supp. 3d 372, 377 (E.D.N.Y. 2015) ("The Court's first step in evaluating a motion to dismiss for *forum non conveniens* due to a forum-selection clause is to determine whether the clause is valid.")

Here, the forum selection provision is mandatory because it provides that any actions "shall be brought" in New York, and Defendants cannot offer any reason why the Sponsor Agreement, which was executed in order to raise public funds, was the product of fraud or overreach. *See Fasano*, 921 F.3d at 335 (holding that the forum selection clause was "mandatory" because it provided that any action "shall be litigated in [New York]" and plaintiff's decision to file in New York "controls unless [d]efendants can show that the forum selection clause is unreasonable, unjust, fraudulent, or an overreach"). The Motion should be denied on the basis that the forum selection clause is controlling and Defendants have failed to argue otherwise. *See Maersk*, 588 F. Supp. 3d at 505 (denying *forum non conveniens* motion where defendant agreed to contractual forum).

## 2.     Defendants' *Forum Non Conveniens* Arguments Are Baseless

Even if the Court were to consider the Defendants' *forum non conveniens* arguments, none of the "convenience factors" actually weigh in favor of the Cayman Islands. "[A] court reviewing a motion to dismiss for *forum non conveniens* should begin with the assumption that the plaintiff's choice of forum will stand unless the defendant meets the burden of demonstrating" that the convenience factors suggest otherwise. *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001). These include the "convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense." *Id.*

Here, none of the relevant factors support dismissal: Plaintiff's choice of New York is "presumed to be convenient" because the case was filed here, *id.* at 71; none of the witnesses are located in the Cayman Islands; Defendants each list his or her business address in New York (¶ 32); and Defendants' unusual willingness to "travel to the Cayman Islands" is merely indicative of their preference to proceed before liquidators in the Cayman Islands rather than this Court. While the entity was formed in the Cayman Islands, the SPAC was sponsored and managed by exclusively U.S. individuals and entities with business addresses in New York; raised capital from U.S. investors through a New York based underwriter (Citigroup Global Markets) to make an acquisition of a U.S. company; traded continuously only in the U.S. on NASDAQ; and otherwise had no relationship whatsoever to the Cayman Islands.[4]

### 3.    Defendants' Various Remaining Jurisdictional Arguments All Fail

Defendants' "forum shopping" and other arguments are fundamentally flawed and change nothing about the multiple independently dispositive reasons that this Motion should be denied.

As an initial matter, the Cayman Petition is not duplicative. It was filed for the purpose of protecting and preserving the equity interests of Class A stockholders by rendering any purported redemption or asset transfer void upon institution of the proceeding. (Goodman Dec. ¶ 3.) Before filing the Petition, Plaintiff demanded that Defendants "immediately pay the Break Fee into the [SPAC's] Trust Account" so that the sum would be distributed to public stockholders through the

---

[4]    Defendants' citations to cases in which the plaintiff "chose to do business in a foreign country" (MTD at 9) have no application whatsoever to this case. *Cf. Aenergy, S.A. v. Republic of Angola*, 2021 WL 1998725, at *15 (S.D.N.Y. May 19, 2021) ("When [plaintiffs] decided to do business in Angola and with the Angolan government, [p]laintiffs made a decision to subject themselves to Angolan law"); *BFI Grp. Divino Corp. v. JSC Russian Aluminum*, 298 F. App'x 87, 92 (2d Cir. 2008) (dismissing action arising from "private solicitation by the Nigerian government in the United States" for investment in "a Nigerian government-owned company" given that "many of the witnesses and evidence [were] in Nigeria and the minimal connection or interest the district and its citizens had to the case as compared with the interest Nigeria").

redemption, and noted that it "had recently commenced litigation in the southern district of New York, the need for which may be obviated if you were to act as set forth in the previous paragraph [*i.e.*, immediately distribute the assets to Class A stockholders]." (*Id.* ¶ 4.)

Defendants did not agree to distribute the Termination Fee to investors, nor did they agree, at that time, to preserve the SPAC's Termination Fee in the interim. (*Id.* ¶ 5.) Accordingly, Plaintiff filed the Petition, which under Cayman law immediately rendered the redemption of Class A Public Shares voidable upon the appointment of third-party liquidators. (*Id.* ¶ 5.) Notwithstanding the filing and service of the Petition, Defendants purportedly *conducted the redemption anyway*. (*Id.* ¶ 6.) Then, through Cayman counsel, Defendants entreated Plaintiff to agree to an ex post facto validation of the redemption, which Plaintiff refused. (*Id.*) Defendants now seek to resolve the question of Cayman law regarding the voidability of the redemption by seeking a validation order in connection with the winding up proceeding. (*Id.* ¶ 7.) Irrespective of the outcome of that dispute or the resolution of this action, the SPAC will be wound up in the Cayman Islands. (¶ 8.) The Petition, if allowed, will merely ensure that the liquidation is conducted by outside liquidators, under judicial supervision, for the protection of Class A stockholders from further misconduct on the part of Defendants. (*Id.*) Plaintiff expects that the liquidators will look to this Court as to *the merits* of the claims before this Court (which has exclusive jurisdiction and is best suited to adjudicate legal and equitable claims) and any judgment in this action will be binding on the parties. (*Id.* ¶ 9.)

Defendants' various arguments that "the Cayman Islands is an adequate forum to hear all of the claims Plaintiff has asserted in this action," the "liquidators could also resolve Plaintiff's breach of fiduciary duty and unjust enrichment claims," or the claims "would likely be resolved by a judge from the Cayman Court through the winding up process" are both inaccurate and

irrelevant.[5] Defendants chose (years ago) to adjudicate disputes relating to the SPAC and Sponsor in New York and Plaintiff chose the same when it filed this action. Whether Plaintiff *could* have filed in the Cayman Islands and obtained a comparable adjudication is purely academic.

Defendants also argue that the Cayman Islands is an adequate forum because "Plaintiff itself initiated the Cayman proceeding." But the cases they cite are in no way analogous and actually rebut their position. *See In re Herald*, 540 F. App'x 19, 27 (2d Cir. 2013) (dismissing class action in favor of foreign forum because, unlike this case, there were "hundreds of similar cases brought by the Funds themselves and by the Funds' investors are already pending in the courts of those two countries"); *Evolution Online Sys., Inc. v. Koninklijke Nederland N.V.*, 41 F. Supp. 2d 447, 451 (S.D.N.Y. 1999) (enforcing a "choice-of-forum" provision that, unlike this case, selected a foreign forum and stating that if plaintiff "wishes to pursue its claims further . . . pursue them in the Dutch courts").

Defendants erroneously argue that this action "seeks to take advantage of the generosity of juries in the United States." (MTD at 11.) But to the extent that there are material fact disputes in this action (which appears doubtful at this stage), this action seeks merely the return of corporate assets belonging to the SPAC's public stockholders, not a "generous" jury verdict.

Finally, Defendants claim that dual actions are "inconvenient and expensive." But the actions are not duplicative, and thus there is no waste.[6]

---

[5]   The Cayman winding up proceeding is not a lawsuit and Plaintiff does not assert the "claims" set forth in this action for a Cayman court's resolution. (Goodman Dec. ¶ 9.) The proceeding merely seeks a winding up order and the liquidators are likely to look to this Court for resolution of the substantive claims set forth in the Amended Complaint in this action. (*Id.*)

[6]   Defendants halfheartedly argue that "international comity principles" also support dismissal, but none of the factors weigh in Defendants' favor. (MTD at 16-17.) This action was filed first, it was filed in the contractually selected forum, it is the most convenient for all parties (all of whom live in the U.S.), it turns, in large part, on New York law, and it is not duplicative of

## II.     DEFENDANTS' MOTION TO DISMISS PURSUANT TO
## FED. R. CIV. P. 12(B)(6) LIKEWISE SHOULD BE DENIED

### A.     Pleading Standard

Plaintiff's claims are governed by Fed. R. Civ. P. 8(a), which requires only "a short and

plain statement of the claim showing that the pleader is entitled to relief." This standard "do[es]

not require heightened fact pleading specifics." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). Rather, to survive a motion to dismiss, a complaint must simply contain "sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). While this plausibility standard requires a plaintiff to show that success

on the merits is more than a "sheer possibility," it is not a "probability requirement." *Id.* When

reviewing a motion to dismiss, a district court "accepts all well-pleaded factual allegations as true

and draws all reasonable inferences in favor of the claiming party." *First Solar, Inc. v. Absolute*

*Process Instruments, Inc.*, 2018 WL 1166632, at *2 (S.D.N.Y. Feb. 8, 2018).

### B.     Plaintiff Has Sufficiently Pled Third-Party
### Standing To Enforce The Sponsor Agreement

#### 1.     Plaintiff And The Class Are The Intended
#### Beneficiaries Of The Sponsor Agreement

"It is ancient law in New York" that an "intended beneficiary of the contract" may enforce

the contract on "a third party beneficiary theory." *Nanopierce Techs., Inc. v. Southridge Cap.*

*Mgmt.*, 2008 WL 250553, at *6 (S.D.N.Y. Jan. 29, 2008) (holding that third-party had standing to

enforce lock-up agreement intended to keep "shares off the market while [the third party] sold the

stock that it received from [an agreement]"). Under New York law, "the third-party beneficiary

concept arises from the notion that it is just and practical to permit the person for whose benefit

---

the Cayman winding up proceeding. Notwithstanding Defendants' personal views on what might
be the "natural forum" for this dispute, the principles of comity provide no basis whatsoever to
defer to the courts of the Cayman Islands.

the contract is made to enforce it against one whose duty it is to pay or perform." *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 44 (1985).

Enforcement of the Sponsor Agreement is "just and practical" here. *Id.* Plaintiff and the other Class A stockholders were not only intended beneficiaries of the Sponsor Agreement, but they are the *exclusive beneficiaries* of the provision acknowledging Defendants have no right to the assets of the SPAC in the event of a liquidation. The Sponsor Agreement laid out the rules applicable to the public offering of Class A Public Shares to stockholders, and prevented Defendants from doing a range of things that would harm public stockholders, including *misappropriating corporate assets that belong to stockholders in a liquidation*. Specifically, Defendants agreed that "it, she or he has no right, title, interest or claim of any kind in or to any monies held in the Trust Account *or any other asset of the [SPAC]* as a result of any liquidation of the [SPAC]." (Morris Dec. Ex. B § 4(b) (emphasis added).)

Class A stockholders (who are referenced as "Public Shareholders" throughout the Sponsor Agreement) are effectively the only beneficiaries of this anti-theft provision in a liquidation: no other party to the agreement stands to directly benefit from it or would have standing to enforce it because the benefits of a proper distribution of corporate assets inure exclusively to public stockholders as the rightful recipients. Not surprisingly, the Sponsor Agreement *does not disclaim third-party beneficiaries or otherwise preclude the enforcement of the anti-theft provision by stockholders, as its sole beneficiaries*. (*See* Morris Dec. Ex. B.)

These circumstances clearly demonstrate third-party beneficiary status under New York law, which has adopted the Restatement (2d) of Contracts, § 302, which states:

> [A] beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either[:]

18

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*See also Subaru Distributors v. Subaru of America*, 425 F.3d 119, 124 (2d Cir. 2005) ("The New York Court of Appeals has adopted Restatement (2d) of Contracts § 302 as an accurate statement of New York third-party-beneficiary law.")

Because only Class A stockholders or Class B stockholders could theoretically receive the SPAC's assets in a liquidation, the effect of the Sponsor Agreement supports only one conclusion: that Class A stockholders were the sole intended beneficiaries as the class of persons standing to benefit from Defendants' waiver of any right to receive the SPAC's assets. These circumstances demonstrate that Defendants intended to "give the [Plaintiff and Class A stockholders] the benefit of the promised performance," *see* Restatement (2d) of Contracts, § 302, and, practically, no others have interest in enforcing the provision. *See Fourth Ocean*, 66 N.Y.2d at 45 (stating that third-party beneficiary status should be recognized where "no one other than the third party can recover if the promisor breaches the contract."). Under these circumstances, Plaintiff has sufficiently alleged third-party standing to enforce the terms of the Sponsor Agreement precluding Defendants from misappropriating assets from the SPAC and its Class A stockholders.

## 2.   The Case Law Cited By Defendants Does Not Suggest Otherwise

Defendants cite *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 336 (1983),[7] in support of their standing argument, but the Court of Appeals, two years later, refined

---

[7]     *Linder* involved a law firm that attempted to recover economic damages from a city-wide transit strike under the theory that public citizens as a whole were third-party beneficiaries of a contract between the two unions at issue, which had in any event "expired before the strike." 59 N.Y.2d at 336-37. The court refused to impose the "crushing burden" of extending the contract to

the standard for finding third-party beneficiary status in *Fourth Ocean,* 66 N.Y.2d at 44, "clearing away some of the unnecessary differentiations and circuitous language set forth in some of those decisions," including *Lindner*. In *Fourth Ocean*, the court adopted the approach stated in the Restatement (2d) of Contracts, which provides that a third-party beneficiary arises where "circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Id.* The court stated that the requirement of an "obligation or duty running from the promisee to the third party beneficiary has been progressively relaxed until a mere shadow of the relationship suffices, if indeed it has not reached the vanishing point." *Id.* at 45. The Court "emphasized [instead] when upholding the third party's right to enforce the contract that no one other than the third party can recover if the promisor breaches the contract" *Id.* Such is the case here, given that Class A stockholders are the only true beneficiaries of the anti-theft provision in the Sponsor Agreement.

Defendants' contention that "*express* language [is required] indicating that a particular party is a third-party beneficiary" is also incorrect. (MTD at 20.) The Court need only find an *intent* of the parties that Plaintiff benefit from the contract (which is plain here), and the absence of express language is not dispositive. *See Fourth Ocean*, 66 N.Y.2d at 44 ("[T]he circumstances to be considered is whether manifestation of the intention of the promisor and promisee is 'sufficient, in a contractual setting, to make reliance by the beneficiary both reasonable and probable'"); *Internationale Nederlanden (U.S.) Capital Corporation v. Bankers Trust Co.*, 261 A.D.2d 117, 123 (N.Y. App. Div. 1999) (holding that courts "should look at the overall purpose of the transaction" and "it is not dispositive that [the] agreement does not explicitly name creditors

---

"every member of the public." *Id.* That case has no application whatsoever to the circumstances here.

such as plaintiffs to be third-party beneficiaries"); *Newin Corp. v. Hartford Acc. & Indem. Co.*, 37 N.Y.2d 211, 219 (1975) (holding that the "mere absence in a contract of any provision either excluding or including such coverage does not necessarily preclude proof that unnamed third-party beneficiaries were intended to be benefited").[8]

### 3.    Defendants Cannot Rewrite the Sponsor Agreement Or Avoid Their Obligations Under It

Defendants argue that "the Sponsor Agreement states that upon redemption, stockholders would be entitled to a pro-rata share of the trust account, nothing more" (MTD at 22), but the Sponsor Agreement says no such thing. Section 4(a) of the Sponsor Agreement plainly requires that the Trust Account be distributed in its entirety to Class A shareholders, but it does not preclude Class A shareholders from receiving other assets of the SPAC regardless of whether they are maintained in, or excluded from, the Trust Account. (*See* Morris Dec. Ex. B.)

In contrast, Section 4(b) of the Sponsor Agreement expressly does divest Class B shareholders of any interest in the assets of the SPAC, including not only "monies held in the Trust Account," but also "any other asset of the Company." (*Id.*) Thus, under the terms of the Sponsor Agreement, Class A stockholders are entitled to receive a distribution of assets upon winding up and liquidation of the SPAC while Class B stockholders simply are not. Defendants' efforts to distribute the Termination Fee to themselves anyway is a clear breach.

---

[8]    New York courts have "required express contractual language" only with respect to a *construction* contract, which was at issue in the case cited by Defendants. *See Dormitory Auth. v. Samson Construction Co.*, 30 N.Y.3d 704, 710 (2018) ("With respect to construction contracts, we have generally required express contractual language stating that the contracting parties intended to benefit a third party."). Defendants' other case citation is likewise inapplicable: in *Consolidated Edison v. Northeast Utilities*, 426 F.3d 524, 526 (2d Cir. 2005), the contract "expressly designated" a third-party beneficiary, which ended the analysis.

Even if Class A shareholders' entitlement to receive the Termination Fee was contingent on the fee being deposited in the Trust Account, that condition was not satisfied only because *Defendants chose to segregate the Termination Fee* outside of the Trust Account. Under the "prevention doctrine," Defendants cannot deprive Class A shareholders of their contractual rights by using their control of the SPAC to prevent fulfillment of a condition precedent. *See Vector Media, LLC v. Golden Touch Transp. of NY, Inc.*, 189 A.D.3d 654, 655 (1st Dept. 2020) ("If a promisor himself is the cause of the failure of performance of a condition upon which his own liability depends, he cannot take advantage of the failure."); *St. Christopher's, Inc. v. JMP Acquisitions, LLC*, 2021 WL 6122674, at *4 (2d Cir. Dec. 28, 2021) (relying on prevention doctrine to reverse dismissal of counterclaim). The fact that Defendants self-interestedly chose not to deposit the Termination Fee in the Trust Account does not eliminate the class's right to the assets in a liquidation, much less create an entitlement on the part of Defendants to receive it.

### C.   Plaintiff Has Sufficiently Pled A Direct Claim For Breach Of Fiduciary Duties

Directors of Cayman Islands companies owe fiduciary duties of loyalty, honesty, and good faith. (Mot. at 19; *see also* Henderson Decl. ¶¶ 21-23.) Defendants do not dispute their duties, nor can they dispute that the facts of this case demonstrate a breach: Defendants made a series of objectively conflicted, disloyal and self-interested decisions designed to procure, for themselves, the Termination Fee at the expense of the SPAC's public stockholders. (¶¶ 66, 69, 74.)

Instead, Defendants seek a procedural out by arguing that Plaintiff, and the class of Class A stockholders, lack standing to assert the fiduciary claims directly, despite that stockholders possess a direct and exclusive financial interest in misappropriated assets, and as a result have incurred a direct and exclusive injury as a result of Defendants' breaches. (Mot. at 19-20.) While fiduciary duties in the Cayman Islands "generally" are owed to the company itself, the law is not

as rigid as Defendants or their paid expert suggest. Indeed, as this Court has recognized, directors of Cayman Islands companies may owe fiduciary duties directly to stockholders, which can be enforced directly by stockholders. *See In re CIL, Ltd.*, 2018 WL 2383102, at *2-3 (S.D.N.Y. May 4, 2018).

> These duties may arise in special circumstances which replicate the salient features of well established categories of fiduciary relationships. Fiduciary relationships, such as agency, involve duties of trust, confidence and loyalty. Those duties are, in general, attracted by and attached to a person who undertakes, or who, depending on all the circumstances, is treated as having assumed, responsibility to act on behalf of, or for the benefit of, another person.

*Id.* at *3 (quoting *Peskin v. Anderson*, [2001] EWCA (Civ) 1 BCLC 372, 379).

Here, the facts of this case and the unique structure of a SPAC, which differs significantly from an operating company, demonstrate that Defendants owed duties directly to stockholders. Defendants solicited money from stockholders for the sole purpose of acquiring a private company or else they would distribute the assets back; neither the Sponsor nor SPAC had any other personnel or business operations. (¶¶ 2, 20, 35.) Stockholders put their trust solely in the Sponsor and other Defendants to identify and negotiate a valuable deal, and the Sponsor undertook the responsibility to exercise the skill, expertise and diligence necessary to identify and close such a transaction on behalf of stockholders. (*See* IPO Prospectus, Morris Dec. Ex. A at 4 ("We believe that our management team's extensive experience and knowledge of local markets, access to leaders and innovators, and proven deal-sourcing capabilities presents [*sic*] an opportunity to create significant long-term value for our shareholders.").) Stockholders did not purchase a share of an operating enterprise as in a typical public company investment; they purchased, in advance, a ticket to a show that Defendants promised to arrange. A traditional agency relationship, giving

rise to a direct duty of loyalty, is one of the recognized exceptions under Cayman Islands law to the general position that directors owe their fiduciary duties to the company.[9]

The nature of the harm in this case likewise demonstrates the direct fiduciary relationship between Defendants and stockholders. The injury caused by Defendants' breaches was suffered directly and exclusively by Plaintiff and the other Class A stockholders because the Termination Fee—which belongs to them—was wrongfully excluded from the distribution to stockholders so that it could be misappropriated by Defendants. The SPAC itself does not appear to have been injured by Defendants' conduct, given that it is liquidating its assets in any event. Indeed, the end result from the SPAC's perspective is the same: the Termination Fee will go out the door to one class of stockholders or the other. Because the injury fell directly and exclusively on Plaintiff and other Class A stockholders, the damages are not merely "reflective" of a generalized injury to the SPAC—there was no such injury. As a matter of logic, direct pursuit of damages under these circumstances cannot violate the "no reflective loss" principle under Cayman Islands law.[10] (*See* Henderson Decl. ¶ 26.)

Considering the alternative—*i.e.*, pleading the claims derivatively—also demonstrates why the claims are not derivative in nature. Any recovery would necessarily accrue to the SPAC itself (which currently holds the assets in any event), and thus would solve nothing: the SPAC would obtain a judgment for the recovery of assets it already holds, and thus would still need to distribute

---

[9]     None of the cases cited by Defendants involve SPACs or similar agency relationships. *See, e.g.*, *In re CIL*, 2018 WL 2383102, at *1-2 (claims relating to corporate restructuring).

[10]     Mr. Henderson effectively admits as much in his declaration, which states that "[i]t is possible for a director or directors to so conduct themselves as to breach a personal and individual right of a particular shareholder, in which case that shareholder may have a valid claim of breach of fiduciary duty" where the harm is "something other than a reduction in the value of the shareholding to avoid the 'no reflective loss' principle." (Henderson Decl. at 8, n. 14.) This case presents such circumstances for the reasons above.

the assets to one set of stockholders or the other. This nonsensical result would leave the parties in the same dispute they are currently in. For these reasons, Defendants' Motion should be denied and the Court should permit stockholders to seek their losses directly from the fiduciaries who caused them.[11]

## **CONCLUSION**

For the foregoing reasons, Plaintiff submits that Defendants' Motion should be denied, except that Plaintiff consents to the dismissal without prejudice of the unjust enrichment claim.

Dated: March 20, 2023

Respectfully submitted,

By: /s/ Aaron T. Morris

**MORRIS KANDINOV LLP**
Aaron T. Morris (#5675178)
Andrew W. Robertson (#4288882)
1740 Broadway, 15th Floor
New York, NY 10019
(877) 216-1552
aaron@moka.law
andrew@moka.law

**AFN LAW, PLLC**
Angus F. Ni (#5208673)
506 2nd Ave., Suite 1400
Seattle, WA 98104
(646) 453-7294
angus@afnlegal.com

*Attorneys for Plaintiff*

---

[11] The Court should, at a minimum, deny Defendants' motion to permit narrow discovery on the nature of the direct agency relationship between Plaintiffs and Defendants under the unique circumstances of this case. In the alternative, if the Court determines that the fiduciary claims must be alleged derivatively, Plaintiff respectfully requests leave to amend. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."); se*e also, e.g., Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 597 (S.D.N.Y. 2006) (granting leave to replead class action claims derivatively). Contrary to Defendants' contention, Plaintiff has not been divested of derivative standing by the invalid redemption of Class A stockholders.