**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FUNICULAR FUNDS, LP, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>PIONEER MERGER CORP., PIONEER MERGER SPONSOR LLC, JONATHAN CHRISTODORO, RICK GERSON, OSCAR SALAZAR, RYAN KHOURY, SCOTT CARPENTER, MATTHEW COREY, MITCHELL CAPLAN and TODD DAVIS,<br><br>     Defendants. | Case No. 22-cv-10986-JSR<br><br>**ECF Case** |

**PIONEER MERGER SPONSOR LLC'S AND INDIVIDUAL DEFENDANTS'**
**MEMORANDUM OF LAW IN SUPPORT OF**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

**KIRKLAND & ELLIS LLP**
Stefan Atkinson
Kyla Jackson
Amanda Lamothe-Cadet
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
stefan.atkinson@kirkland.com
kyla.jackson@kirkland.com
amanda.lamothecadet@kirkland.com

*Attorneys for Defendants Pioneer*
*Merger Sponsor LLC, Jonathan*
*Christodoro, Rick Gerson, Oscar*
*Salazar, Ryan Khoury, Scott*
*Carpenter, Matthew Corey, Mitchell*
*Caplan, and Todd Davis*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION................................................................................................... 1

UNDISPUTED FACTS ......................................................................................... 3

    A.    The Parties ......................................................................................... 3

    B.    The Articles........................................................................................ 3

    C.    The Sponsor Agreement, Pioneer's IPO, and the Trust Account ........................... 4

    D.    Acorns Business Combination Agreement and Termination Fee Agreement........................................................................................... 5

    E.    Pioneer Discloses Termination Fee Will Be Held Outside of Trust Account. ............................................................................................. 6

    F.    Plaintiff Purchases Pioneer Shares Shortly Before Filing This Action. .................. 6

    G.    This Litigation and the Redemption of Class A Shares .................................. 7

    H.    The Winding Up Proceedings ................................................................ 8

ARGUMENT ....................................................................................................... 8

II.    LEGAL STANDARD .................................................................................. 10

III.    PLAINTIFF HAS NOT DEMONSTRATED ANY GENUINE DISPUTE OF MATERIAL FACT THAT DEFENDANTS BREACHED THE SPONSOR AGREEMENT. ....................................................................................... 10

    A.    Distributing the Termination Fee to the Class B Shareholders Would Not Constitute a Breach of the Sponsor Agreement. ..................................... 11

        1.    When Read as a Whole, the Sponsor Agreement Makes Clear that Class A Shareholders Are Not Entitled to Assets Outside of the Trust Account................................................................... 11

        2.    The Only Permissible Conclusion From Reading the IPO Transaction Documents Together is That Sponsor and Individual Defendants *Only* Waived Their Rights to the Trust Account. ................ 13

        3.    Plaintiff Failed to Preserve Former Class A Shareholders' Rights, and the Sponsor Agreement Has Now Terminated and Is No Longer Enforceable................................................................. 15

        4.    The Termination Fee Has Not Been Transferred to Class B Shareholders, thus Plaintiff Cannot Demonstrate a Breach of the Sponsor Agreement................................................................. 16

    B.    The Sponsor and Individual Defendants Have No Control Over Distribution of the Termination Fee and Should Be Dismissed from This Action................................................................................................ 17

i

IV.   **PLAINTIFF IS NOT A THIRD-PARTY BENEFICIARY TO THE SPONSOR AGREEMENT AND CANNOT ENFORCE ITS TERMS.** .................. **17**

    A.   Plaintiff Has Not Raised a Triable Issue of Fact That Defendants Intended Class A Shareholders to Have an Enforceable Benefit to a Purported Waiver of Assets Outside of the Trust Account. .................................... 18

        1.   The Purpose of the Sponsor Agreement Confirms Class A Shareholders Were Not Third-Party Beneficiaries. ................................. 18

        2.   The Sponsor Agreement Confirms Class A Shareholders Were Not Intended to Benefit from a Purported Waiver of Assets Outside of the Trust Account.................................................................................. 19

        3.   SPAC Customs and Practices Confirm Class A Shareholders Are Only Entitled to Their Pro Rata Share of the Trust Account. ................... 21

    B.   Alternatively, Section 4(b) Is Ambiguous and Requires Consideration of Extrinsic Evidence, Which Confirms That Class A Shareholders Did Not Expect to Receive Funds Outside the Trust Account. ......................... 22

V.   **PLAINTIFF CANNOT DEMONSTRATE ENTITLEMENT TO THE ENTIRE $32.5 MILLION TERMINATION FEE** ....................................... **23**

VI.   **DEFENDANTS ASK THE COURT TO RECONSIDER ITS FINDINGS AS TO CLASS A SHAREHOLDERS' RIGHTS UNDER THE SPONSOR AGREEMENT.** ..................................................................................... **23**

VII.  **PLAINTIFF'S BREACH OF CONTRACT CLAIM IS FORECLOSED BY AFFIRMATIVE DEFENSES.** .......................................................... **24**

    A.   In the Alternative, If Plaintiff Is a Third-Party Beneficiary, Plaintiff Is Subject to a Mitigation Defense Based on a Repudiation of the Sponsor Agreement............................................................................................. 24

    B.   The Voluntary Payment Doctrine Bars Plaintiff's Breach of Contract Claim............................................................................................................ 25

**CONCLUSION** ....................................................................................... **25**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adrien Logistics LLC v. Certain Underwriters at Lloyd's London*,
No. 22-cv- 3002, 2023 WL 2257748 (S.D.N.Y. Feb. 27, 2023) ...........................................19

*ALH Properties Ten, Inc. v 306-100th St. Owners Corp.*,
191 A.D.2d 1 (1st Dept 1993)........................................................................................13, 14

*Ambush Alarm and Elecs., Inc. v. 606 Second Ave. Rest. Corp.*,
100 N.Y.S.3d 609 (Sup. Ct. Apr. 5, 2018)........................................................................8, 16

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*,
618 F. Supp. 2d 280 (S.D.N.Y. 2009)....................................................................................24

*Atl. Specialty Ins. Co. v. AE Outfitters Retail Co.*,
2014 WL 1918718 (S.D.N.Y. May 12, 2014) .......................................................................11

*Caro Capital, LLC v. Koch*,
2023 WL 1103668 (S.D.N.Y. Jan. 30, 2023) .......................................................................25

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...............................................................................................................10

*Cnty. Of Suffolk, N.Y. v. Sebelius*,
605 F.3d 135 (2d Cir. 2010)...................................................................................................16

*Cohen v. Loeb Partners Corp.*,
1992 WL 84535 ......................................................................................................................17

*Columbus Monument Corp. v. City of Syracuse*,
193 N.Y.S.3d 497 (2023)........................................................................................................18

*Columbus Park Corp. v. Dep't of Hous. Pres. & Dev. of City of New York*,
80 N.Y.2d 19 (1992) ...............................................................................................................12

*Comerica Leasing Corp. v. Bomardier Inc.*,
No. 16-cv-614, 2019 WL 11027701 (S.D.N.Y. Sept. 30, 2019) ...........................................13

*Commonwealth Land Title Ins. Co. v. Am. Signature Servs., Inc.*,
No. 13-cv-3266, 2014 WL 672926 (E.D.N.Y. Feb. 20, 2014) ..............................................20

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,
Pierce, Fenner & Smith Inc.*,
232 F.3d 153 (2d Cir. 2000)....................................................................................................22

*Courtland v. Walston & Co.*,
    340 F. Supp. 1076 (S.D.N.Y. 1972)..................................................................24

*Dillon v. U-A Columbia Cablevision of Westchester*,
    100 N.Y.2d 535 (N.Y. 2003) ..........................................................................25

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins.*,
    261 F. Supp. 2d 293 (S.D.N.Y. 2003)............................................................16

*Esposito v. Suffolk County Cmty. College*,
    2023 WL 192671 (2d Cir. Jan. 17, 2023) ......................................................24

*Fields Enterprises Inc. v. Bristol Harbour Vill. Ass'n, Inc.*,
    217 A.D.3d 1433 (2023) .................................................................................18

*Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*,
    2023 WL 3868585 (S.D.N.Y. June 7, 2023) ..................................................17

*Gimbel Bros., Inc. v. Brook Shopping Centers, Inc.*,
    499 N.Y.S. 2d 435 (1986)...............................................................................25

*Holloway v. Ernst & Young LLP*,
    28 Misc. 3d 1214(A), 2010 WL 2927256 (Sup. Ct. 2010) .............................19

*Hosokawa v. Screen Actors Guild-Am.*,
    234 F. Supp. 3d 437 (S.D.N.Y. 2017).............................................................10

*Intelligent Digital Sys., LLC v. Beazley Ins. Co., Inc.*,
    716 F. App'x 1 (2d Cir. 2017) ........................................................................22

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005)............................................................................10

*L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010)..............................................................10, 11, 15

*Last Time Beverage Corp. v. F&V Distrib. Co.*,
    98 A.D.3d 947 (2d Dep't 2012) ...............................................................21, 22

*Liberty Surplus Ins. Corp. v. Segal Co.*,
    2004 WL 2102090 (S.D.N.Y. Sep. 21, 2004).................................................17

*Martha Graham School and Dance Found. V. Martha Graham Ctr. Of Contemporary Dance*,
    43 Fed. App'x 408 (2d Cir. 2002)...................................................................15

*Matana v. Merkin*,
    989 F. Supp. 2d 313 (S.D.N.Y. 2013).............................................................19

*Middle East Banking Co. v. State Street Bank Int'l*,
  821 F.2d 897 (2d Cir. 1987)...................................................................................24

*Oursler v. Women's Interart Ctr., Inc.*,
  170 A.D.2d 407 (1991) ......................................................................................20

*Peoples v. Fischer*,
  898 F. Supp. 2d 618 (S.D.N.Y. 2012)...............................................................24

*Pile Found. Const. Co. v. Berger, Lehman Assocs., P.C.*,
  253 A.D.2d 484 (1998) ......................................................................................20

*Solutia Inc. v. FMC Corp.*,
  385 F. Supp. 2d 324 (S.D.N.Y. Mar. 29, 2005)...........................................18, 19

*Suffolk Cty. Water Auth. v. Vill. of Greenport*,
  21 A.D.3d 947 (2d Dept 2005) ..........................................................................12

*United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*,
  988 F. Supp. 367 (S.D.N.Y. 1997) .....................................................................20

*Walker v. Thompson*,
  404 F.Supp.3d 819 (S.D.N.Y. 2019)...................................................................12

*Wells Fargo Bank, N.A. v. Fin. Sec. Assur. Inc.*,
  504 Fed. App'x 38 (2d Cir. 2012)........................................................................13

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................10

## INTRODUCTION

Plaintiff Funicular Funds, LP ("Funicular") seeks to wield a simple, now-terminated waiver as an offensive weapon to lay claim to tens of millions of dollars that it never had any expectation of receiving.  Specifically, Funicular claims a breach of a provision in the letter agreement among Defendants ("Sponsor Agreement") that allegedly prohibits Class B shareholders from receiving certain assets of Pioneer Merger Corp. ("Pioneer").  Plaintiff ignores that the one, central promise made to Class A shareholders by Pioneer—a return of their investment plus interest—has been fulfilled.  Plaintiff also turns a blind eye to numerous agreements that confirm its deal with Pioneer has been honored.  Plaintiff offers no evidence to prove how this "waiver" grants Pioneer's former Class A shareholders any *affirmative* right to the remaining assets of Pioneer.  The undisputed fact is that Plaintiff's rights as shareholders, including rights to any further liquidation distributions, were "completely extinguish[ed]" upon the redemption of their shares in accordance with Pioneer's governing document, the Amended and Restated Memorandum and Articles of Association ("Articles"), as confirmed by the now-terminated Sponsor Agreement.

Class A shareholders' inability to enforce a purported right to further distributions is consistent with ample fact and expert discovery that confirms there has been no breach of the Sponsor Agreement.  When reviewing Section 4(b) of the Sponsor Agreement in the context of other provisions of the contract (*e.g.*, Section 4(a), the contract's stated purpose to assist the underwriter, and the non-assignability clause), the Articles, Pioneer's prospectus for its initial public offering ("Prospectus"), and customs and practice of SPACs, it is clear that Class B shareholders did not waive their rights to distributions in Pioneer's liquidation.  Every single relevant agreement unequivocally states that Class A shareholders, like Plaintiff, were only entitled to their pro rata share of the trust account, and receipt of those funds upon redemption "completely extinguish[ed]" their rights as shareholders, including their rights to any further distributions.

Upon such extinguishment, the Articles, Pioneer's ***only*** contract with its Class A shareholders, provides that any surplus assets of Pioneer will be distributed to Class B shareholders in its liquidation.  Further, it is undisputed that the action Plaintiff seeks to challenge, a distribution to the Class B shareholders, has not occurred, and Pioneer's assets are now controlled by independent liquidators.  Equally important, the commencement of Pioneer's winding up renders any future "breach" impossible because the Sponsor Agreement, by its express terms, terminated upon Pioneer's liquidation, which commenced months ago.  As a result, Plaintiff cannot raise a genuine dispute of material fact that a distribution of the Termination Fee to the Class B shareholders is prohibited by the Sponsor Agreement, which was terminated months before any breach could have occurred.

Plaintiff's lack of entitlement to assets outside of the trust account is equally fatal to its request to enforce the Sponsor Agreement as a third-party beneficiary.  New York precedent is clear that the Sponsor Agreement must be read with other agreements from the IPO.  Plaintiff has not identified any provision in any Pioneer agreement that directs the distribution of funds outside of Pioneer's trust account to Class A shareholders.  Instead, Plaintiff's claim rests solely on the misreading of a waiver, *not a stated right*, and ignores that every agreement regarding Pioneer provides that Class A shareholders were only entitled to their pro rata share of Pioneer's trust account.  And, as stated in the Articles, Class B shareholders, the only remaining shareholders of Pioneer, are to receive its final distributions in liquidation, after payments to creditors.  As such, there is no genuine dispute of material fact that Class A shareholders are not intended beneficiaries to a purported right to force a distribution of Pioneer's assets to a single class of its shareholders in contravention of the Articles.[1]

---

[1]    Sponsor and Individual Defendants also join in Pioneer's Motion for Summary Judgment.

For similar reasons, Defendants also move for reconsideration of the Court's October 26, 2023 Opinion on Defendants' motion to dismiss ("Opinion") as to the Court's findings as a matter of law that (i) Class A shareholders are third-party beneficiaries to the Sponsor Agreement and (ii) Class B shareholders waived any right to the Trust Account and "any other asset" of Pioneer. As stated above, when Section 4(b) is read in connection with other provisions of the Sponsor Agreement, the Articles, the Prospectus, and SPAC customs and practice, Plaintiff lacks the ability to enforce any alleged breach of the agreement. Under the plain language and consistent with the intent of the Sponsor Agreement, Plaintiff's rights with respect to Pioneer have been "completely extinguish[ed]," and Defendants did not waive their rights to assets outside of the Trust Account.

In the alternative, should the Court find a breach of the Sponsor Agreement, the Court should deny Plaintiff damages based on its continued purchase of Class A shares despite knowing that Pioneer did not intend to distribute the Termination Fee to Class A shareholders. Finally, the Court should find that any damages award should be reduced by the amount of validly incurred expenses of the SPAC, which are not subject to the waiver in Section 4(b).

## UNDISPUTED FACTS

### A. The Parties

Defendant Pioneer is a special purpose acquisition company ("SPAC") incorporated in the Cayman Islands on October 21, 2020. *See* Sponsor's and Individual Defs.' R. 56.1 Stmt. ("Defs.' 56.1") ¶1. Defendant Sponsor is a Cayman Islands limited liability company. *Id.* ¶ 3. Individual Defendants are officers and/or directors of Pioneer. *Id.* ¶ 5. Plaintiff Funicular Funds is a hedge fund managed by Jacob Ma-Weaver. *Id.* ¶ 6. Prior to the January 13, 2023 redemption of Class A shares, Plaintiff was a holder of Pioneer's Class A shares. *Id.* ¶ 7.

### B. The Articles

Pioneer is governed by its Articles. *Id.* ¶ 9. The Articles establish a two-class capital

structure: (1) Class A ordinary shares or public shares, which were issued during Pioneer's IPO; and (2) Class B ordinary shares, which were issued prior to the IPO to the Sponsor and certain of the Individual Defendants. *See id.* ¶¶ 10-12. Consistent with its business purpose, if Pioneer failed to consummate an initial business combination within 24 months of its IPO (by January 12, 2023), Pioneer would be required to redeem the Class A shares. *Id.* ¶ 13. Upon such redemption, each Class A shareholder would receive their initial $10 per share investment, plus accrued interest, and all other rights of Class A shareholders would be extinguished. *Id.* ¶ 14. "[S]uch redemption w[ould] ***completely extinguish*** public [shareholders'] rights as [shareholders] (including the right to receive further liquidation distributions, if any)." *Id.* Thereafter, the Class B shareholders, which would be Pioneer's only shareholders, would be required to initiate Pioneer's winding up. *Id.* ¶ 16. If Pioneer's assets remaining following redemption were insufficient to cover debt owed to its creditors, the Class B shareholders would receive nothing (a scenario that could have caused difficulties when carrying out the Class A redemption, though it did not arise here). *Id.* ¶¶ 17-20. However, if there were surplus assets following payment to creditors, per the Articles and statutory waterfall of the Cayman Islands Companies Act, the remaining net assets would be distributed to Class B shareholders pro rata to their respective shareholdings before dissolution. *Id.*

### C.    The Sponsor Agreement, Pioneer's IPO, and the Trust Account

Shortly after the Articles were adopted, Pioneer entered into an Underwriting Agreement with Citigroup Global Markets Inc. ("Citigroup"). *Id.* ¶ 21. "[T]o induce Pioneer and [CitiGroup] to enter into the Underwriting Agreement and to proceed with the Public Offering," Pioneer, Sponsor, and the Individual Defendants entered into the Sponsor Agreement, dated January 12, 2021. *Id.* The Sponsor Agreement repeats the same language from the Articles, explaining that, if Pioneer failed to consummate an initial business combination within 24 months of its IPO, each Class A shareholder would receive their initial $10 per share investment, plus accrued interest,

4

"which redemption will completely extinguish Public [Class A] Shareholders' rights as shareholders (including the right to receive further liquidation distributions, if any)." *Id.* ¶¶ 14, 23-24. Sponsor and the Individual Defendants agreed that they were not entitled to funds in the Trust Account. *Id.* ¶ 26. The Sponsor Agreement terminates "on the earlier of (i) the expiration of the Founder Shares Lock-up Period and (ii) the liquidation of" Pioneer. *Id.* ¶ 27.

On January 12, 2021, Pioneer consummated its IPO. *Id.* ¶ 30. The net proceeds from the IPO were held in a segregated trust account (the "Trust Account"). *Id.* ¶ 31. The Investment Management Trust Agreement ("Trust Agreement") establishing the Trust Account explicitly limited assets that could be held in the Trust Account to proceeds from the IPO and private placement warrants plus any interest earned thereon. *See id.* ¶ 32.

### D.   Acorns Business Combination Agreement and Termination Fee Agreement

On May 27, 2021, Pioneer announced that it had entered into the Business Combination Agreement with Acorns Grow Incorporated ("Acorns"), a financial technology company. *Id.* ¶ 33. After negotiations between the parties broke down, the parties entered into the Termination Fee Agreement, on January 3, 2022. *Id.* ¶ 34. The parties agreed that, if the business combination was not consummated by January 14, 2022, either party could terminate the Business Combination Agreement. *Id.* ¶¶ 35-39. Upon such termination, Acorns would be required to pay Pioneer the Termination Fee, which consisted of $17.5 million up front and an additional $15 million if Pioneer was unable to complete another business combination by December 15, 2022. *Id.*

Acorns ultimately exercised its right to terminate the Business Combination Agreement, triggering its obligation to pay Pioneer a Termination Fee of $17.5 million. *Id.* ¶ 44. On January 18, 2022, Pioneer disclosed the terms of the Termination Agreement. *Id.* ¶ 45. Among other things, Pioneer confirmed that if there were no business combination, Class A shareholders would only be entitled to a pro rata share of the amount held in the Trust Account. *Id.* ¶ 46.

**E.      Pioneer Discloses Termination Fee Will Be Held Outside of Trust Account.**

On March 30, 2022, Pioneer disclosed that if it failed to complete an initial business combination, "payments under the Termination Fee Agreement, [would be] expected to remain outside of the trust account and not be part of liquidating distributions with respect to the public shares." *Id.* ¶ 48.  Pioneer further reiterated that Class A shareholders would only be entitled to their pro rata share of the amount held in the Trust Account in the event of a redemption of the Class A shares.  *Id.* ¶¶ 49-50.  Pioneer made identical disclosures on May 13, 2022; August 15, 2022; and November 10, 2022.  *Id.* ¶ 51.

On December 15, 2022, Pioneer announced that it would not be able to consummate a potential business combination and would redeem all outstanding Class A shares with each Class A shareholder receiving a pro rata portion of the funds held in the Trust Account.  *Id.* ¶ 52.  Pioneer stated that "[b]ased on the balance of the Company's trust account as of December 15, 2022, such amount per share is expected to be $10.10 plus interest accrued through January 12, 2022.  Upon such redemption, the rights as shareholders of the Class A ordinary shares will completely extinguish." *Id.* ¶ 53.  On January 13, 2023, Pioneer redeemed the assets held in the Trust Account and subsequently distributed those funds to the Class A shareholders.  *Id.* ¶ 7.

**F.      Plaintiff Purchases Pioneer Shares Shortly Before Filing This Action.**

On December 15, 2022, Plaintiff purchased 66,099 Class A shares of Pioneer—its very first purchase of Pioneer Class A shares.  *Id.* ¶ 60.  Notwithstanding Pioneer's numerous disclosures that the Termination Fee would not be included in any distributions to Class A shareholders, Plaintiff purchased an additional 1,085,653 Class A shares on December 16, 2022. *Id.* ¶ 63.  Plaintiff then purchased 76,304 Class A shares on December 19, 2022, and 1,286,485 Class A shares on December 20, 2022.  *Id.* ¶ 64.

In Plaintiff's Schedule 13D concerning its purchases of Class A shares, Plaintiff

acknowledged that Pioneer had clearly stated how it would treat the Termination Fee.  *See Id.* ¶¶ 65-67  (citing Plaintiff's Schedule 13D) ("[T]he Reporting Persons discussed with a representative of [Pioneer] *the stated intent of its sponsor* to improperly arrogate for itself and related parties a $32.5 million termination fee payment . . . .") (emphasis added).  Plaintiff further stated that it believed the intention to distribute the Termination Fee to the Class B shareholders "would violate [Sponsor's] legal and contractual duties owed to [Pioneer]" and that if the Sponsor did not reconsider, Plaintiff would "consider all available legal remedies to protect the interests of stockholders." *Id.*  Plaintiff purchased more than 2.2 million shares of Pioneer Class A stock even though Plaintiff understood that "Sponsor" did not intend to distribute the Termination Fee to the Class A shareholders.  *Id.* ¶¶ 60-61, 63-67.

G.     **This Litigation and the Redemption of Class A Shares**

On the same day that Plaintiff filed its Schedule 13D, Plaintiff filed this lawsuit on behalf of itself and a putative class of Pioneer's Class A shareholders, asserting claims for breach of fiduciary duty, breach of contract, and unjust enrichment.  Compl., ECF No. 1.  The Court dismissed Plaintiff's claim for breach of fiduciary duty, and Plaintiff voluntarily withdrew its claim for unjust enrichment.  Order, ECF No. 22.  Plaintiff's only remaining claim is a breach of contract claim under the Sponsor Agreement and its request for declaratory judgment.  *Id.*

On January 13, 2023, pursuant to the Articles, Defendants redeemed the Class A shares and each Class A shareholder, including Plaintiff, received its pro rata share of the Trust Account, plus interest.  As a result, Class A shareholders' rights were completely extinguished.  *See* Defs.' 56.1 ¶¶ 23-24 (The "redemption will completely extinguish [Class A shareholders'] rights . . . including the right to receive further liquidation distributions, if any.").  Following the redemption and as of the date of this motion, the only remaining shareholders of Pioneer are the Class B shareholders.

H.     **The Winding Up Proceedings**

On January 12, 2023, after initiating this litigation, Plaintiff filed a separate winding up petition ("Petition") in the Cayman Islands seeking the appointment of two joint official liquidators to conduct Pioneer's winding up under the supervision of the Grand Court of the Cayman Islands ("Cayman Court").   Defs.' 56.1 ¶ 67.   Plaintiff argued that the appointment of independent liquidators was appropriate because, among other reasons, Pioneer's leadership had supposedly breached the Articles, the Sponsor Agreement, and their fiduciary duties under Cayman law by "diverting" the Termination Fee to themselves, as holders of the Class B shares.   *Id.* ¶ 69. Ultimately, due to Plaintiff's lack of standing, the Cayman Court dismissed the Petition with Plaintiff's consent.   *See id.* ¶ 70.   On August 11, 2023, following Plaintiff's repeated insistence, the Class B shareholders passed a special resolution to place Pioneer into voluntary winding-up and appointed joint voluntary  liquidators, who have subsequently brought the liquidation under the supervision of the Grand Court of the Cayman Islands.   *Id.* ¶ 71.

## ARGUMENT

Plaintiff argues that the Sponsor and Individual Defendants purportedly "waived" their rights to the Termination Fee, and their receipt of those funds would constitute a breach of the Sponsor Agreement.   Class A shareholders, including Plaintiff, were already made whole with the redemption of Class A shares, and cannot raise a genuine dispute of material fact as to Class A shareholders' rights to any further distributions of Pioneer's assets for the following reasons.

*First*, documents executed in connection with the IPO, which must be read when interpreting the Sponsor Agreement, confirm that any waiver of Class B shareholder's rights under Section 4(b) was limited to the Trust Account.   Specifically, the Articles, which govern Pioneer and its relationship with its shareholders, provide that in a liquidation, the Class B shareholders are to receive Pioneer's final distributions.

*Second*, the Sponsor Agreement terminated prior to any potential breach.  The distribution Plaintiff complains of has not occurred, and because the Sponsor Agreement has since terminated according to its terms, *without the Class B shareholders receiving the disputed funds*, any subsequent determination by the liquidators that the Class B shareholders should receive the remaining assets could not result in any breach of the Sponsor Agreement by Defendants.

*Third*, even if the Court finds a dispute of triable fact as to the survival of the Sponsor Agreement and as to whether there has been a breach of the Sponsor Agreement, because of the commencement of the voluntary liquidation in the Cayman Islands, Sponsor and the Individual Defendants no longer have control over how the final assets of the SPAC will be distributed. Rather, that power rests solely with the liquidators, who have filed an application with the Cayman Court to determine to whom they are required to distribute the SPAC's surplus assets.  Thus, Sponsor and the Individual Defendants are no longer parties to this controversy, and both counts of the Complaint should be dismissed as to those defendants.

*Fourth*, discovery has confirmed that Plaintiff is not a third-party beneficiary of the Sponsor Agreement.  The stated purpose of the Sponsor Agreement was to encourage the underwriter to move forward with the IPO, not to create additional rights for shareholders of the SPAC.  The transaction documents, including the Articles and the Prospectus, confirm the contracting parties did not intend to promise any performance to the Class A Shareholders other than a return of their pro rata share of the Trust Account.  Both the Articles and the Sponsor Agreement expressly state that a redemption of Class A shareholders' shares will "completely extinguish [Class A] Shareholders' rights as shareholders (including the right to receive further liquidation distributions, if any)."  Defs.' 56.1 ¶¶ 23-25.  Absent a clear promise by Defendants to other assets of Pioneer, Class A shareholders cannot enforce any right to further distributions.

*Fifth*, even assuming a breach of the Sponsor Agreement, Plaintiff cannot demonstrate entitlement to the full Termination Fee, given the SPAC's validly incurred expenses.

*Sixth*, similarly, Plaintiff is not entitled to damages because it purchased all of its shares— more than two million shares in all—*after* learning Pioneer did not intend to distribute the Termination Fee to Class A shareholders, which is contrary to its duty to mitigate and the voluntary payment doctrine.

## II.     LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 321-23 (1986).  "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).  A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* (citation omitted).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."  *Id.* (citation omitted).

## III.    PLAINTIFF HAS NOT DEMONSTRATED ANY GENUINE DISPUTE OF MATERIAL FACT THAT DEFENDANTS BREACHED THE SPONSOR AGREEMENT.

To demonstrate a claim for breach of contract under New York law, which governs the Sponsor Agreement, Plaintiff must establish: "(1) the existence of a contract; (2) breach; and (3) damages resulting from, or caused by, that breach." *Hosokawa v. Screen Actors Guild-Am.*, 234 F. Supp. 3d 437, 444 (S.D.N.Y. 2017) (citation omitted).  "Where the parties dispute the meaning of particular contract clauses, the task of the court 'is to determine whether such clauses

are ambiguous when read in the context of the entire agreement[.]'" *L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). "[W]here consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity[.]" *Id.* at 467 (citation omitted). The Court may consider evidence of "custom and usage" where it is "necessary to understand the context in which the parties have used terms that are specialized." *Id.* at 466 (explaining custom and usage includes proof that language is "fixed and invariable" in the relevant industry). In all events, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Id.* at 468.

## A.   Distributing the Termination Fee to the Class B Shareholders Would Not Constitute a Breach of the Sponsor Agreement.

Reviewing the Sponsor Agreement as a whole and in connection with the Articles (the actual contract between Pioneer and its shareholders) and the Prospectus, as well as considering customs and practices for SPACs more generally, it is clear the Sponsor and Individual Defendants *only* waived their rights to the Trust Account. Consistent with this waiver, both the Sponsor Agreement and the Articles *expressly* permit distributions to Class B Shareholders after Class A shareholders' rights have been extinguished, thereby defeating Plaintiff's breach of contract claim. Defs.' 56.1 ¶¶14, 24. Even if the waiver was as broad as Plaintiff alleges, Plaintiff's claim still fails. Plaintiff cannot enforce the Sponsor Agreement because by its own terms, it terminated on August 11, 2023, prior to any distribution of the remaining amount of the Termination Fee. *Id.* ¶¶ 27, 71. If the appointed liquidators determine the remaining assets should be given to Class B holders, the receipt of such funds would not constitute a breach because the Sponsor Agreement terminated on "the liquidation of the Company." *Id.* ¶ 27.

1.   When Read as a Whole, the Sponsor Agreement Makes Clear that Class A

Shareholders Are Not Entitled to Assets Outside of the Trust Account.

Under New York law, a contract "should be construed so as to give full meaning and effect to all of its provisions." *Atl. Specialty Ins. Co. v. AE Outfitters Retail Co.*, 2014 WL 1918718 at *4 (S.D.N.Y. May 12, 2014) (citation omitted). "[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.  Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." *Walker v. Thompson*, 404 F.Supp.3d 819, 825 (S.D.N.Y. 2019); *see also Columbus Park Corp. v. Dep't of Hous. Pres. & Dev. of City of New York*, 80 N.Y.2d 19, 31 (1992). (same).

While Plaintiff argues that Section 4(b) of the Sponsor Agreement demands a reading that Class B shareholders have waived any and all rights to all remaining assets of the SPAC, such an interpretation would render Section 4(a) of the Sponsor Agreement superfluous, if not directly contradictory to Section 4(b).  Section 4(a) provides that "redemption will ***completely extinguish*** [Class A] Shareholders' rights as shareholders (***including the right to receive further liquidation distributions, if any***)."  Defs.' 56.1 ¶ 24 (emphasis added).  The fact that Section 4(a) provides that the Class A shareholders waive their rights to "further liquidation distributions, if any," means that Class A shareholders have no right to any further recovery, and only the Class B shareholders would receive any remaining distributions that are made.  An interpretation of the Sponsor Agreement that Class B shareholders waived *all rights* to any asset of Pioneer cannot be reconciled with the possibility of further distributions to Class B shareholders, which is explicitly allowed by the Sponsor Agreement.  Plaintiff's theory would read Section 4(a) out of the Sponsor Agreement by disregarding the complete extinguishment of all Class A shareholders' rights as shareholders.  New York law requires that each provision of the Sponsor Agreement be given meaning.  *See Suffolk Cty. Water Auth. v. Vill. of Greenport*, 21 A.D.3d 947, 948 (2d Dept 2005) ("[It is a] basic

principle[] of contract construction that an interpretation which renders language in the contract superfluous is unsupportable.").

        2.      The Only Permissible Conclusion From Reading the IPO Transaction Documents Together is That Sponsor and Individual Defendants *Only* Waived Their Rights to the Trust Account.

"Under New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even [if] they were executed on different dates and were not all between the same parties.'" *Comerica Leasing Corp. v. Bomardier Inc.*, No. 16-cv-614, 2019 WL 11027701 (S.D.N.Y. Sept. 30, 2019) (citation omitted); *see also Wells Fargo Bank, N.A. v. Fin. Sec. Assur. Inc.*, 504 Fed. App'x 38, 40 (2d Cir. 2012) (summary order) (holding that prospectus supplement and other transaction documents should be considered in interpreting the contract).

New York law thus requires that the Sponsor Agreement be read in connection with other documents that were executed to effectuate the IPO, including the Articles (the only contract to which the Class A shareholders are a party), the Prospectus, Trust Agreement, and Underwriting Agreement, which were all filed together.  Thus, while the Sponsor Agreement provides that Sponsor and Individual Defendants "acknowledge[] that it, she or he has no right, title, interest or claim of any kind in or to any monies held in the Trust Account or any other asset of the Company as a result of any liquidation of the Company" (Defs.' 56.1 ¶ 27), that disclaimer must be read in conjunction with other documents from the IPO, as those writings form part of the same agreement.

Both the Articles and Prospectus confirm Section 4(b)'s waiver applies only to the Trust Account.  As a threshold matter, the Articles provide the framework for Class A shareholders' rights as the "governing document" of the SPAC, and the *only* agreement to which Class A shareholders were a party.  *See ALH Properties Ten, Inc. v 306-100th St. Owners Corp.*, 191 A.D.2d 1, at \*16 (1st Dept 1993) ("The bylaws of the corporation constitute a contract between

the shareholders and the corporation.  The parties' rights must be adjudicated according to the unambiguous terms thereof and the words and phrases therein must be given their plain meaning."); *see also* Defs.' 56.1 ¶ 9.  Pursuant to the Articles, if Pioneer failed to consummate a Business Combination within 24 months of the IPO, Pioneer was required to take certain steps for the purpose of winding up.  Among those, Pioneer was required to "redeem the Public Shares, at a per-Share price . . . equal to the aggregate amount then on deposit in the Trust Account."  *Id.* ¶ 25.  Upon the redemption, Class A shareholders' rights would be "***completely extinguish[ed]***," such that the only remaining members of Pioneer would be the Class B shareholders.  *Id.* (emphasis added); *see also id.* ¶ 24.  Class A shareholders were expressly prohibited from receiving "further liquidation distributions, if any."  *Id.*  Following the redemption, Pioneer would "liquidate and dissolve."  *Id.* ¶¶ 17, 25.  A liquidation would include distributing surplus assets to the Class B shareholders, as Pioneer's only remaining shareholders.  *See id.* ¶ 18.  This process, mandated by the Articles, cannot be completed if the waiver is as broad as Plaintiff claims.

If, as Plaintiff argues, the Class B shareholders have waived any and all rights to remaining assets of Pioneer, there is no way to reconcile the procedures in the Articles with the Sponsor Agreement.  The Articles expressly contemplate that during the winding up of Pioneer, surplus assets remaining after creditors have been paid would be distributed to the remaining shareholders of Pioneer—the Class B shareholders.  *Id.* ¶ 18.  And there would be no reason to include a warning to the Class A shareholders that the redemption would "***completely extinguish*** [their] rights as [shareholders]" or that they would not be entitled to "further liquidation distributions, if any," if, as Plaintiff contends, the Class A shareholders' were to receive all assets of the SPAC.  *Id.* (emphasis added).  One cannot give meaning to the procedures in the Articles and also find that Class B shareholders are prohibited from receiving any distributions of Pioneer's assets.

14

Consistent with the Articles, the Prospectus also describes the Sponsor Agreement as providing for only a waiver of the Trust Account.  *See id.* ¶ 26. ("Our sponsor and each member of our management team have entered into an agreement with us, pursuant to which they have agreed to ***waive their rights to liquidating distributions from the trust account*** with respect to any founder shares they hold if we fail to consummate an initial business combination") (emphasis added).  Plaintiff cannot explain why, here again, the waiver only applies to the Trust Account.

The customs and practices of SPACs confirm that the language of Section 4(b) referencing "any other asset of the Company as a result of any liquidation," should not be interpreted as covering the Termination Fee because termination fees are historically rare for a SPAC to receive for a broken deal.  Defs.' 56.1 ¶ 40.  *See also L. Debenture Tr. Co. of New York*, 595 F.3d at 465 (explaining customs and practices permitted to understand context of parties' agreement). Typically, the trust account *i.e.*, the IPO proceeds, is a SPAC's only significant asset, and it is generally understood that any waiver to distributions will protect those assets.  Defs.' 56.1 ¶ 57. Under the terms of the Trust Agreement, Pioneer could not even deposit the Termination Fee into the Trust Account, and thus had no obligation to do so.  *Id. ¶* 32.  There is no evidence that any of the SPAC's shareholders or Defendants expected that a disclaimer of rights to "any other asset of the Company as a result of any liquidation" would include a termination fee.  *See id.* ¶ 57 (testimony of Pioneer Sponsor and Davis, confirming no expectation of termination fee); *id.* ¶¶ 55, 58 (Solomon testimony that "Class A shareholders have no expectation and . . . in accord with custom and practice to anything outside the trust account and their only expectation is to . . . the trust account").

   3. Plaintiff Failed to Preserve Former Class A Shareholders' Rights, and the Sponsor Agreement Has Now Terminated and Is No Longer Enforceable.

Also fatal to Plaintiff's claim is that the agreement it seeks to enforce is no longer in effect.

Pursuant to the Sponsor Agreement's own terms, it terminated upon the commencement of Pioneer's liquidation on August 11, 2023. *Id.* ¶ 27. If, as Plaintiff argues, a distribution of the Termination Fee proceeds to the Class B Shareholders would constitute a breach of the Sponsor Agreement, that breach could only occur ***after*** that agreement has already been terminated, barring any such enforcement. *See Martha Graham School and Dance Found. V. Martha Graham Ctr. Of Contemporary Dance*, 43 Fed. App'x 408, 415 (2d Cir. 2002) (affirming denial of injunction because "plaintiffs are seeking to do what contract law does not permit them, namely, terminate the Agreement and then enforce the provisions of that Agreement"); *Ambush Alarm and Elecs., Inc. v. 606 Second Ave. Rest. Corp.*, 100 N.Y.S.3d 609 (Table), at *2 (Sup. Ct. Apr. 5, 2018) (defendant's contractual obligations "are unenforceable against him, as his obligations terminated . . . upon the expiration of the contract"). Plaintiff failed to take appropriate steps to preserve the status quo, for example, seeking an injunction to prevent the extinguishment of Class A shareholders' rights and the termination of the agreement. *See Cnty. Of Suffolk, N.Y. v. Sebelius*, 605 F.3d 135, 142 (2d Cir. 2010) (plaintiff's failure to preserve status quo during the proceedings rendered claim moot). Having failed to do so, Plaintiff cannot demonstrate the enforceability of the Sponsor Agreement once Pioneer has entered liquidation.

        4.     The Termination Fee Has Not Been Transferred to Class B Shareholders, thus Plaintiff Cannot Demonstrate a Breach of the Sponsor Agreement.

Plaintiff's breach of contract claim must fail because the Termination Fee has not been distributed to Class B shareholders. There is no dispute that the remaining Termination Fee funds remain with Pioneer, as Plaintiff previously requested at the start of this litigation. Am. Compl. ¶ 18 ("The SPAC has stated it will not distribute its remaining assets, including the Termination Fee, until resolution of litigation."). Even if Class B shareholders waived their rights to assets outside of the Trust Account, no decision has been made by Pioneer's liquidators as to whether

Class B shareholders should receive such funds. Because the conduct that Plaintiff claims is prohibited under the Sponsor Agreement has not occurred, it cannot demonstrate a triable issue of fact as to the breach of contract claim. *See Duane Reade, Inc. v. St. Paul Fire & Marine Ins.*, 261 F. Supp. 2d 293, 295 (dismissing complaint, in part, because "payment by defendant is not yet due, and plaintiff's claims for contractual damages are premature"); *Liberty Surplus Ins. Corp. v. Segal Co.*, 2004 WL 2102090 (S.D.N.Y. Sep. 21, 2004) ("[A] contract 'is not breached until the time set for performance has expired.'") (citation omitted).

Further, Plaintiff's breach of contract claim provides the party "with an adequate remedy," thus declaratory relief is "unnecessary and inappropriate." *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*, 2023 WL 3868585, at *14–15 (S.D.N.Y. June 7, 2023) (citation omitted). Having failed to raise a genuine dispute of triable fact as to Class A shareholders' entitlement to assets outside of the trust account, both Counts should be dismissed.

      **B.** **The Sponsor and Individual Defendants Have No Control Over Distribution of the Termination Fee and Should Be Dismissed from This Action.**

Regardless of whether the Court agrees with the Sponsor and Individual Defendants' interpretation of the Sponsor Agreement, the Court should dismiss both Counts as to them. Now that the SPAC is under the control of joint liquidators (Defs.' 56.1 ¶ 72), who will make the final determination as to the disposition of any remaining assets of Pioneer (*id.* ¶ 19), these defendants are no longer parties to the controversy. The Sponsor and Individual Defendants do not have control over the Termination Fee and have no role in how they may be distributed (*id.*), thus, they should be dismissed. *See Cohen v. Loeb Partners Corp.*, 1992 WL 84535, at *4 (dismissing action due to parties' lack of involvement in an actual controversy).

**IV.** **PLAINTIFF IS NOT A THIRD-PARTY BENEFICIARY TO THE SPONSOR AGREEMENT AND CANNOT ENFORCE ITS TERMS.**

To maintain an action as a third-party beneficiary under New York law a party must show:

"(1) the existence of a valid and binding contract between other parties; (2) that the contract was intended for [their] benefit; and (3) that the benefit to [them] is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [them] if the benefit is lost." *Fields Enterprises Inc. v. Bristol Harbour Vill. Ass'n, Inc.*, 217 A.D.3d 1433, 1436 (2023) (citations and internal quotations omitted).  To demonstrate a direct, as opposed to an incidental benefit, "'the circumstances [must] indicate that the promisee intends to give the beneficiary the benefit of the promised performance' or that the promised performance is to be made directly to that party." *Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 337 (S.D.N.Y. Mar. 29, 2005) (citations and internal quotations omitted).  New York Courts have found such an enforceable right in two situations: first, "when the third party is the only one who could recover for the breach of contract" or second, "when it is otherwise clear from the language of the contract that there was an intent to permit enforcement by the third party." *Columbus Monument Corp. v. City of Syracuse*, 193 N.Y.S.3d 497, 504 (2023) (citation omitted and internal quotations omitted). Here, Plaintiff does not have a right to enforce the Sponsor Agreement because there is no evidence Class A shareholders have an enforceable right to receive assets outside of the Trust Account. And, as described above (*see supra* at III.A.), even if Plaintiff was an intended beneficiary, the Sponsor Agreement terminated on August 11, 2023, and with it, any ability to enforce that agreement.  Plaintiff therefore cannot demonstrate a genuine issue of material fact as to its third-party beneficiary status.

> **A.** **Plaintiff Has Not Raised a Triable Issue of Fact That Defendants Intended Class A Shareholders to Have an Enforceable Benefit to a Purported Waiver of Assets Outside of the Trust Account.**
>
> > 1. The Purpose of the Sponsor Agreement Confirms Class A Shareholders Were Not Third-Party Beneficiaries.

"[I]n determining whether a third party has standing to enforce a contract, the Court must

'look at the overall purpose of the transaction.'" *Solutia*, 385 F. Supp. 2d at 337 (citations and internal quotations omitted). The purpose of the Sponsor Agreement is apparent from the face of the document: "to induce the Company and the Underwriter to enter into the Underwriting Agreement and to proceed with the Public Offering . . . ." Defs.' 56.1 ¶ 11; *see also Adrien Logistics LLC v. Certain Underwriters at Lloyd's London*, No. 22-cv- 3002, 2023 WL 2257748, at *4 (S.D.N.Y. Feb. 27, 2023) ("To determine the intention of the contracting parties, courts consider the contract and the circumstances attendant to its execution.").[2] And while the Trust Agreement identifies public shareholders as "Beneficiaries," the Sponsor Agreement includes no such reference. Defs.' 56.1 ¶ 32. Plaintiff has offered no evidence to create a genuine dispute of material fact that there was any other purpose for the Sponsor Agreement.

Moreover, the fact that the contract is related to an IPO does not make Plaintiff, who purchased its shares two years later, the intended beneficiary of the contract. Courts have routinely held that shareholders of a corporation are not third-party beneficiaries to the corporation's contracts. *See Matana v. Merkin*, 989 F. Supp. 2d 313, 319 (S.D.N.Y. 2013) ("shareholders of a corporation . . . are not third-party beneficiaries of contracts entered into by that corporation"); *Solutia*, 385 F. Supp. 2d at 338 ("[A] benefit received through corporate ownership is insufficient to establish rights as a third-party beneficiary.") (collecting cases); *Holloway v. Ernst & Young LLP*, 28 Misc. 3d 1214(A), 2010 WL 2927256, at *4 (Sup. Ct. 2010) (same). Plaintiff has offered no evidence to defeat this well-established presumption.

        2.    The Sponsor Agreement Confirms Class A Shareholders Were Not Intended to Benefit from a Purported Waiver of Assets Outside of the Trust Account.

---

[2] Defendants' testimony confirms the purpose of the Sponsor Agreement was to provide the underwriter with assurances prior to undertaking the IPO. *See* Defs.' 56.1 ¶ 22 (testimony of Caplan, Davis, and Sponsor confirming purpose of Sponsor Agreement).

19

The Sponsor Agreement does not evince an intent for Class A Shareholders to enforce the Sponsor and Individual Defendants' purported waiver of Pioneer's other assets as a result of any liquidation. The Sponsor Agreement states that upon redemption, Class A shareholders would be entitled to a pro rata share of the Trust Account, nothing more. Defs.' 56.1 ¶ 24. There is no provision, in either the Sponsor Agreement or the Articles, that provides a mechanism to distribute to the Class A Shareholders *any asset other than the Trust Account*. To the contrary, under Section 4(a), Class A shareholders' rights to assets through a liquidation were completely extinguished upon the redemption. *Id.* The Sponsor Agreement cannot be said to both prohibit Class A shareholders' entitlement to any funds beyond the redemption, and, at the same time, also grant additional, broader rights to Class A shareholders as third-party beneficiaries to such funds. *See Oursler v. Women's Interart Ctr., Inc.*, 170 A.D.2d 407, 407, (1991) (finding plaintiff was not a third-party beneficiary where "nothing in the [relevant contract] clearly show[ed] an intent by the [contract's parties] to permit enforcement of the contract by the plaintiffs"); *Pile Found. Const. Co. v. Berger, Lehman Assocs., P.C.*, 253 A.D.2d 484, 486 (1998) (plaintiff was not a third-party beneficiary where it failed to "submit any evidence, from the contractual language or otherwise, manifesting a mutual intent of the contracting parties to confer upon it any rights").

The Sponsor Agreement also contains an express "non-assignment" clause, confirming that enforcement is not permitted by third parties. *See* Defs.' 56.1 ¶ 28. "Non-assignability clauses have been held to negate third-party beneficiary status, even where assignment was permitted with prior written approval." *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 988 F. Supp. 367, 373 (S.D.N.Y. 1997) (finding party lacked third-party beneficiary status in part because of non-assignability clause); *see also Commonwealth Land Title Ins. Co. v. Am. Signature Servs., Inc.*, No. 13-cv-3266, 2014 WL 672926, at *7 (E.D.N.Y. Feb. 20, 2014) (collecting cases).

3.    SPAC Customs and Practices Confirm Class A Shareholders Are Only Entitled to Their Pro Rata Share of the Trust Account.

Plaintiff has also failed to create a triable issue of fact as to whether, as a matter of industry customs and practices, public shareholders reasonably expected to receive distributions beyond funds held in the Trust Account.  Consideration of industry practice is appropriate where "usage was so notorious in the industry that a person of ordinary prudence in the exercise of reasonable care would be aware of it."  *Last Time Beverage Corp. v. F&V Distrib. Co.*, 98 A.D.3d 947, 951-52 (2d Dep't 2012).  It is well understood in this industry that public shareholders are only entitled to a SPAC's trust account.  Defs.' 56.1 ¶ 15.  In the context of this established practice, Section 4(b) does not confer third-party beneficiary status to enforce a purported waiver to assets outside of the Trust Account.

As Professor Solomon explains, the custom and practice is that "public company SPAC shareholders have a right only to . . . their pro rata share of the trust account."  *Id.*  This custom and practice is due in large part to the "risk free" nature of public shareholders investment.  *Id.* Given that public shareholders are all but guaranteed a return of their initial investment, Class A shareholders reasonably only expect to receive a pro rata share of the trust account plus interest in the event of a liquidation.  *Id.*  Such expectations comport with academic literature on SPACs that concludes that Class A shareholders are sophisticated investors who know that they "are entitled only to the trust proceeds upon liquidation."  *Id.* ¶ 41.

In addition, industry practice for distribution of termination fees further supports the conclusion that the Class A shareholders were not intended third-party beneficiaries of Section 4(b)'s alleged waiver to assets outside of the trust account.  As Professor Solomon's report notes, there are nine SPACs that did not distribute any of their termination fees to public shareholders.  *Id.* ¶ 58.  By contrast, Plaintiff's experts only identified one SPAC that paid

termination fees as dividends to public shareholders in a liquidation. *Id.* ¶ 59. However, even there, the sponsor owned 87.7% of the Class A shares, and thus received the majority of the termination fee. *Id.* Hence, when considering SPAC customs and practices, there is no genuine dispute of material fact that Section 4(b) does not permit Class A shareholders to compel a distribution of Pioneer's remaining assets to public shareholders whose rights were extinguished.

> **B.** **Alternatively, Section 4(b) Is Ambiguous and Requires Consideration of Extrinsic Evidence, Which Confirms That Class A Shareholders Did Not Expect to Receive Funds Outside the Trust Account.**

Alternatively, the Court should determine that the phrase "any other assets as a result of liquidation" is ambiguous. *Id.* Where language in a contract is ambiguous, summary judgment can be granted "if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000); *see also Intelligent Digital Sys., LLC v. Beazley Ins. Co., Inc.*, 716 F. App'x 1, 4 (2d Cir. 2017) ("The court may admit expert evidence of industry custom or trade usage to provide context for its legal decision about whether a contract is ambiguous."). Here, all relevant extrinsic evidence supports the conclusion that the phrase "any other assets as a result of liquidation" refers to the assets held in the trust account. It does not, as Plaintiff argues, mean any other assets of the SPAC. As stated above, Section 4(a) of the contract, the Prospectus, the Articles' winding up procedures, and custom and practice support Defendants' interpretation.

A number of other important considerations in SPAC customs and practices confirm that any waiver of assets by Class B shareholders should be limited to the Trust Account. *See supra*, Sec. IV.A.3 (detailing that Class A shareholders generally only expect a return of their pro rata share of the trust account). According to Defendants' expert on SPAC customs and practices, the Class A share trading history does not reflect an expectation that the Termination Fee would be

distributed to public shareholders.  Defs.' 56.1 ¶ 55.  "[I]f shareholders would have expected to receive the Termination Fee with a high likelihood, Pioneer's Class A stock should have traded close to $10.80—equal to the IPO proceeds . . . plus the termination fee . . . divided by the . . . shares outstanding."  *Id.* ¶ 56.  However, Pioneer stock traded at a price that "reflect[ed] only the proceeds already in the trust account."  *Id.* ¶ 57.  Pioneer's stock price also remained static following the disclosure announcing that the Termination Fee would "not be part of liquidating distributions with respect to the public shares."  *Id.* ¶ 54.  The lack of any meaningful change to the share price further confirms that Class A shareholders did not expect to receive the Termination Fee under the Sponsor Agreement.  *Id.* ¶ 55.

## V.   PLAINTIFF CANNOT DEMONSTRATE ENTITLEMENT TO THE ENTIRE $32.5 MILLION TERMINATION FEE.

Even if the Court were to find Plaintiff had established a breach of the Sponsor Agreement, Plaintiff cannot demonstrate entitlement to the full $32.5 million Termination Fee.  Any amounts that Pioneer paid to creditors and service providers, including for Defendants' validly incurred indemnification expenses, are not covered by the purported waiver that prohibits distributions "as a result of any liquidation of the Company with respect to the Founder Shares held by it, her or him."  Defs.' 56.1 ¶ 26.  Plaintiff cannot prove that Defendants are not entitled to indemnification or that a claw back of any prior expenditures is appropriate even if Defendants breached the Sponsor Agreement.

## VI.   DEFENDANTS ASK THE COURT TO RECONSIDER ITS FINDINGS AS TO CLASS A SHAREHOLDERS' RIGHTS UNDER THE SPONSOR AGREEMENT.

Defendants ask the Court to reconsider its holdings that (i) Class A shareholders are third-party beneficiaries to the Sponsor Agreement and (ii) Class B shareholders waived any right to the Trust Account and "any other asset" of Pioneer.  A motion for reconsideration is appropriate where "the moving party can point to controlling decisions or data that the court overlooked—matters, in

other words, that might reasonably be expected to alter the conclusion reached by the court.  A motion for reconsideration may also be granted to correct a clear error or prevent manifest injustice."  *Peoples v. Fischer*, 898 F. Supp. 2d 618, 623 (S.D.N.Y. 2012) (citations omitted); *see also Esposito v. Suffolk County Cmty. College*, 2023 WL 192671 (2d Cir. Jan. 17, 2023) ("The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."). The Court reached its findings based only on the pleadings and the Sponsor Agreement.  Op., ECF No. 43.  Since then, liquidators have been appointed (Defs.' 56.1 ¶ 72) and Defendants have adduced substantial evidence confirming that Class B shareholders customarily only waive rights to assets in the Trust Account, Class A shareholders did not expect to receive funds outside of the Trust Account (*id.* ¶¶ 41, 55-56), and allowing Class A Shareholders to enforce a right to all assets of the SPAC would render liquidation provisions in the Articles meaningless.  This evidence demands reconsideration of these holdings and confirms Plaintiff's failure to create a genuine issue of material fact to defeat summary judgment.

## VII.   PLAINTIFF'S BREACH OF CONTRACT CLAIM IS FORECLOSED BY AFFIRMATIVE DEFENSES.

### A.   In the Alternative, If Plaintiff Is a Third-Party Beneficiary, Plaintiff Is Subject to a Mitigation Defense Based on a Repudiation of the Sponsor Agreement.

It is well established under New York law that a plaintiff harmed by a purported breach of contract has an obligation mitigate its damages.  *See Courtland v. Walston & Co.*, 340 F. Supp. 1076, 1079-80 (S.D.N.Y. 1972).  "New York requires injured parties to take reasonable steps to minimize damages" and "[n]o recovery may be had for losses which the person injured might have prevented by reasonable efforts and expenditures."  *Middle East Banking Co. v. State Street Bank Int'l*, 821 F.2d 897, 902 (2d Cir. 1987) (citations omitted).  When one party has repudiated its contractual obligations, the non-repudiating party has a duty to mitigate.  *See Aristocrat Leisure*

*Ltd. v. Deutsche Bank Tr. Co. Americas*, 618 F. Supp. 2d 280, 306 (S.D.N.Y. 2009).

Here, even assuming there was a contractual obligation to distribute the Termination Fee to the Class A shareholders under the Sponsor Agreement (and there was not), Plaintiff is not entitled to damages because it failed to mitigate. Defendants' repeatedly disclosed that the Termination Fee would be held outside the Trust Account and not distributed to Class A shareholders (Defs.' 56.1 ¶¶ 48-51), triggering Plaintiff's duty to limit its claim to damages, specifically, not purchase Class A shares. Instead, each of Plaintiff's two million shares were purchased after Pioneer confirmed the treatment of the Termination Fee. *Id.* ¶¶ 61-66. Having failed to mitigate, Plaintiff is not entitled to damages.

### B.    The Voluntary Payment Doctrine Bars Plaintiff's Breach of Contract Claim.

Under New York law, "[t]he voluntary payment doctrine, by its terms, bars recovery for *any* payment made with full knowledge of the facts . . . ." *Caro Capital, LLC v. Koch*, 2023 WL 1103668, at *14 (S.D.N.Y. Jan. 30, 2023) (citation omitted). The doctrine provides that, if "a party intends to resort to litigation in order to resist paying an unjust demand, that party should take its position at the time of the demand and litigate the issue before, rather than after, payment is made." *Gimbel Bros., Inc. v. Brook Shopping Centers, Inc.*, 499 N.Y.S. 2d 435, 439 (1986). Plaintiff purchased all of its shares in Pioneer *after* it learned how the Termination Fee would be treated, for the express purpose of bringing this action. *See* Defs.' 56.1 ¶ 61. Thus, "the policy rationale behind the doctrine—to encourage parties to litigate before, as opposed to after, a payment is made"—bars Plaintiff's requested recovery. *See Dillon v. U-A Columbia Cablevision of Westchester*, 100 N.Y.2d 535, 526 (N.Y. 2003).

### CONCLUSION

For the aforementioned reasons, Sponsor and the Individual Defendants respectfully request that the Court grant their motion for reconsideration and for summary judgment.

Dated: New York, New York                         */s/ Stefan Atkinson*
       November 7, 2023                         Stefan Atkinson
                                                    Kyla Jackson
                                                    Amanda Lamothe-Cadet
                                                    Kirkland & Ellis LLP
                                                    601 Lexington Avenue
                                                    New York, New York 10022
                                                    Telephone: (212) 446-4800
                                                    Facsimile: (212) 446-4900
                                                    stefan.atkinson@kirkland.com
                                                    kyla.jackson@kirkland.com
                                                    amanda.lamothecadet@kirkland.com

                                                    *Attorneys for Defendants Pioneer Merger*
                                                    *Sponsor LLC, Jonathan Christodoro, Rick*
                                                    *Gerson, Oscar Salazar, Ryan Khoury, Scott*
                                                    *Carpenter, Matthew Corey, Mitchell Caplan,*
                                                    *and Todd Davis*